| Current Codification | Interstate Commerce Act | Former Codification |
|---|---|---|
| 49 U.S.C.A. , (West Supp.1980) | | 49 U.S.C. |
| § 10321 | § 12(1) | § 12(1) |
| § 10321 | § 12(2) | § 12(2) |
| § 10321 | § 204(a)(6) | § 304(a)(6) |
| § 10321 | § 204(a)(7) | § 304(a)(7) |
| § 10526(a)(4) | § 203(b)(5) | § 303(b)(5) |
| § 11144(a) | § 20(5) | § 20(5) |

| Current Codification | Interstate Commerce Act | Former Codification |
|---|---|---|
| § 11144(b) | § 220(d) | § 320(d) |
| § 11144(c) | § 220(g) | § 320(g) |
| § 11145(a) | § 220(a) | § 320(a) |
| § 11701 | § 204(c) | § 304(c) |
| § 11702(a)(4) | § 222(b) | § 322(b) |

UNITED STATES of America

v.

DEMANETT, Ronald S.

Appeal of Ronald DEMANETT.

UNITED STATES of America

v.

O'DELL, Pennell L., Jr., Appellant.

UNITED STATES of America

v.

GUERRERO–CHAGUAY, Ernesto Bolivar, Appellant.

UNITED STATES of America

v.

CASTILLO–YEPES, Clemente, Appellant.

UNITED STATES of America

v.

GOMBREWICZ, Charles P.

Appeal of Charles GOMBREWICZ.

Nos. 79–2249, 79–2250, 79–2251, 79–2267 and 79–2292.

United States Court of Appeals, Third Circuit.

Argued June 12, 1980.

Decided July 28, 1980.

Robert J. Del Tufo, U. S. Atty., Newark, N. J., Kenneth N. Laptook, Asst. U. S. Atty., Newark, N. J., on brief, for appellee.

Gerald B. Lefcourt, (argued), New York City, for Ronald Demanett.

James T. Dowd, Caldwell, N. J., for Pennell O'Dell, Jr.

Steven J. Hyman, Hyman & Miner, New York City, for Charles Gombrewicz.

Steven A. Stupak, Cherry Hill, N. J., for Clemente Castillo-Yepes.

Theodore V. Wells, Jr., Lowenstein, Sandler, Brochin, Kohl, Fisher & Boylan, Roseland, N. J., for Ernesto Bolivar Guerrero-Chaguay; Richard Ware Levitt, of counsel.

Before GIBBONS, WEIS and SLOVITER, Circuit Judges.

## OPINION OF THE COURT

GIBBONS, Circuit Judge.

Ronald S. Demanett, Pennell L. O'Dell, Jr., Charles P. Gombrewicz, Ernesto Bolivar Guerrero-Chaguay, and Clemente Castillo-Yepes appeal from judgments of sentence for violations of various statutes prohibiting the importation of marijuana. They contend that the judgments of sentence must be reversed because all the evidence used against them resulted from an unlawful

search and seizure, and should have been suppressed.[1] We affirm.

## I.

On March 21, 1979, the Coast Guard Cutter POINT FRANKLIN, commanded by Lt. John H. Olthuis, was the Duty Patrol Boat for the Southern New Jersey Coast, the Delaware Coast, and Delaware Bay. At 4:30 p. m. while the POINT FRANKLIN was proceeding east at a point five miles outside Delaware Bay, Olthuis observed to the north a 72 foot white commercial fishing boat, headed westerly into Delaware Bay at a speed of 2 to 3 knots. Approaching to within 150 yards, Olthuis discerned the name KRISTEN JANE and the home port "Charleston, South Carolina" on the boat's stern. He noted that it was rigged for net trawling for fish, which was uncharacteristic of fishing boats operating in that area, most of which trawled for shellfish with different gear. He also observed that the trawl doors were lashed in place on the deck, that the deck was clean, and that the trawling gear appeared not to have been used for a long time. From his experience Olthuis thought the 2 to 3 knot speed was uncharacteristicly slow for a fishing vessel heading to port with a catch of fish at that time of day.

Olthuis reported his observations to the Coast Guard station at Cape May, New Jersey, and redirected the POINT FRANKLIN to its original easterly heading away from the KRISTEN JANE. He reconsidered, however, and radioed a request to the Cape May station for an EPIC check on the KRISTEN JANE. An EPIC check is an inquiry to the El Paso Intelligence Center, at which federal law enforcement agencies operate a computer data bank containing information on known and suspected drug smugglers. While awaiting a response to this request Olthuis ordered the POINT FRANKLIN to reverse course and follow the KRISTEN JANE. Shortly thereafter

the Cape May station informed him that the EPIC check on the KRISTEN JANE was negative. The radio conversation between the Cape May station and the POINT FRANKLIN follows.

> Cape May  Coast Guard Cutter Point Franklin, this is the Group Cape May, over.
>
> Pt. Franklin  Group Cape May, Cutter Point Franklin.
>
> Cape May  Roger, we've checked all our (lists) we come up negative, EPIC comes up negative also.
>
> Pt. Franklin  Roger, chief, I've just got a feeling about this guy, he's out of South Carolina, I've never seen him down in this area before. Uh, he's a real slow _____ into Delaware Bay; uh, I don't know. I just don't know where he would be going  .  .  .
>
> Cape May  Uh, Pt. Franklin, this is Group Cape May. If you have any doubts, why don't you go ahead and board them and see maybe you got a problem because you're proceeding so slowly.
>
> Pt. Franklin  Roger. I'll follow them into Delaware Bay. My zodiac, I can't use it yet because I don't have a lifting _____ that's on the old _____ which we're hopefully getting tomorrow, so I'm going to have to pull up along side of him and I'm going to follow him into where it's a little calmer.
>
> Cape May  Uh, Roger. Keep us advised. We'll stay on 381, _____, and, uh, keep us advised of your situation.
>
> Pt. Franklin  Wilco, out.

The reference in the conversation to the zodiac, is to a small boat which would ordinarily be lowered from the POINT FRANKLIN's deck for use in boarding. Its disablement meant that a boarding would have to be made directly from vessel to vessel.

---

1. The trial court held a hearing on the defendants' suppression motion. When it was denied defendants Demanett, O'Dell, and Gombrewicz entered a conditional guilty plea to a single count of conspiracy in violation of 21 U.S.C. § 963 (1976), reserving the right to appeal the denial of their suppression motion. *See United States v. Moskow,* 588 F.2d 882 (3d Cir. 1978). The remaining defendants were convicted on all counts of the indictment in a jury trial.

Olthuis radioed the KRISTEN JANE, identified himself as a Coast Guard officer, and without explaining his purpose, informed those manning the vessel that he intended to board. He ordered the defendants to proceed into the calmer waters of Delaware Bay. They did so, and at 6:00 p. m., after both vessels had entered more sheltered waters, Olthuis maneuvered the POINT FRANKLIN into a boarding position relative to the KRISTEN JANE.[2] As this maneuver took place Petty Officer Cornell noticed that the name KRISTEN JANE and the home port were not permanently affixed to the vessel, but were printed on a placard hung over the stern by lines.

Olthuis ordered Petty Officers Strickland and Cornell to board the KRISTEN JANE. They did so, and were met by O'Dell and Demanett. The Petty Officers explained that they had boarded to inspect for compliance with applicable federal laws, but did not specify those laws. They asked O'Dell and Demanett whether any other persons were on board, and were told that Gombrewicz was the only other person. Strickland asked to see the KRISTEN JANE's documentation papers. Informed they were not on board, he told O'Dell he would have to look for the vessel documentation number imprinted on the main beam. Strickland also noted the absence of certain required navigational aids and safety equipment. At Strickland's request, O'Dell removed the tarpaulin covering the hold so that he could examine the main beam vessel documentation number.[3] Removing the hatch cover revealed 21,580 pounds of marijuana, filling two-thirds of the hold.

Strickland identified the substance and read O'Dell and Demanett their *Miranda* rights. Gombrewicz was brought from the wheelhouse to the fantail where he advised

Cornell that there were others on board. Seven Colombian nationals were located in the aft section of the deckhouse. All were arrested and the KRISTEN JANE was towed to Cape May.

## II.

The defendants concede that once the hatch cover was opened the Coast Guard officers had probable cause to make arrests and to seize the vessel and cargo without a warrant. *See Coolidge v. New Hampshire*, 403 U.S. 443, 466, 91 S.Ct. 2022, 2038, 29 L.Ed.2d 564 (1971). They contend, however, that the seizure of the vessel took place when its crew was ordered by an armed Coast Guard cutter to proceed to calm waters for boarding, and that the seizure and boarding violated the fourth amendment. Thus, they urge, all the evidence of crime which came into plain view when the hatch cover was removed was the fruit of an initial unlawful search and seizure, and should have been suppressed. They contend that the seizure and boarding were invalid because the documentation and safety justifications offered by the government were pretextual and because even if those justifications were not pretextual Lt. Olthuis violated standards laid down by the Supreme Court for administrative inspections.

The trial court declined to rule on the contention that the documentation and safety inspection was pretextual. The court held that the Coast Guard has legal authority to make such inspections on any vessel, and that armed with this actual authority its additional motives are irrelevant. Because the trial court did not find the absence of a criminal investigative motive, in order to affirm we must assume, as the evidence strongly suggests, that Lt. Olthuis was seeking evidence of smuggling, and

2. The trial court made no finding as to the location of the vessels either when the order was made to proceed to calmer waters for boarding, or when the actual boarding occurred. Exhibits G–1 and G–70, in evidence at trial but not at the suppression hearing, place both events in the general vicinity of 38° 50 N, 75° 02′ W, which would be within twelve miles,

but possibly beyond three miles, of Cape Henlopen, Delaware. The precise location of the vessels is not critical to our disposition.

3. Actually the document number was located in the engine room, but there is no evidence that either O'Dell or Strickland knew this at the time of Strickland's request to enter the hold.

that this motivation is irrelevant. The trial court did rule that selection of vessels for documentation inspection on the basis of a Coast Guard commanding officer's subjective hunch did not violate fourth amendment administrative inspection standards.

### A.

### Applicability of the Fourth Amendment

The government does not contend that the fourth amendment is inapplicable to the activities of the Coast Guard at the time and place of the order to proceed to calm waters for boarding. The trial court assumed, as do we, that it applies whether the Coast Guard action took place in the territorial waters of Delaware, in the twelve mile contiguous zone, or on the high seas. *See United States v. Lee*, 274 U.S. 559, 47 S.Ct. 746, 71 L.Ed. 1202 (1927). Moreover, the government makes no contention that any of the defendants arrested on board the vessel lack standing to claim that the search and seizure violated the fourth amendment. We assume, as did the district court, that both the American citizens and the Colombian nationals aboard the vessel were protected by it. *See, e. g., United States v. Conroy*, 589 F.2d 1258, 1264–65 (5th Cir. 1979), *cert. denied*, 444 U.S. 831, 100 S.Ct. 60, 62 L.Ed.2d 40 (1980); *United States v. Cadena*, 585 F.2d 1252, 1262 (5th Cir. 1978); *United States v. Toscanino*, 500 F.2d 267, 280 (2d Cir. 1974).

### B.

### Coast Guard Boarding Authority

Federal statutes provide for registration of vessels engaged in foreign trade, 46 U.S.C. § 11 (1976), and for enrollment of vessels engaged in the coasting trade or fisheries. 46 U.S.C. §§ 251–52 (1976). Only United States vessels may be enrolled, and an unenrolled fishing vessel may not, except as provided by a treaty, land its catch in a port of the United States. 46 U.S.C. § 251(a) (1976). Registration or enrollment results in documentation, and the Commissioner of Customs maintains a system of numbering documented vessels. Every doc-

umented vessel must have her number "deeply carved or otherwise permanently marked on her main beam." 46 U.S.C. § 45 (1976). The name of every documented vessel must be marked upon each bow and the stern, and the vessel's home port must be marked upon the stern. 46 U.S.C. § 46 (1976). The home port must also be shown on the register or enrollment of the vessel, which document is referred to as the vessel's "document." 46 U.S.C. § 18 (1976).

The Coast Guard is responsible for enforcement of all applicable federal laws on waters subject to the jurisdiction of the United States. 14 U.S.C. § 2 (1976). That responsibility includes enforcement of the laws respecting registration or enrollment of vessels.

> The Coast Guard may make inquiries, examinations, inspections, searches, seizures, and arrests upon the high seas and waters over which the United States has jurisdiction, for the prevention, detection, and suppression of violations of laws of the United States. For such purposes . . . officers may at any time go on board of any vessel subject to the jurisdiction, or to the operation of any law, of the United States, address inquiries to those on board, examine the ship's documents and papers, and examine, inspect, and search the vessel and use all necessary force to compel compliance. . . .

14 U.S.C. § 89(a) (1976). Obviously, the federal documentation scheme, of which the vessel's main beam number has always been a key feature, would not be enforceable without some boarding authority. Still, as the government concedes, "the plenary authority to board and inspect, conferred on the Coast Guard by Section 89(a), must be measured against the requirements of the Fourth Amendment". Brief for Appellee at 8. For "no Act of Congress can authorize a violation of the Constitution." *Almeida-Sanchez v. United States*, 413 U.S. 266, 272, 93 S.Ct. 2535, 2539, 37 L.Ed.2d 596 (1973).

## C.

### Expectations of Privacy

Our first inquiry is whether by adopting a documentation scheme for identifying and controlling the trade in which vessels may lawfully engage the Congress has effectively eliminated expectations of privacy with respect to boardings for documentation and main beam number examinations. We conclude that for a vessel the size of the KRISTEN JANE, to which the documentation law applied, there was no expectation that a warrant would be required before such a boarding could take place. There are legitimate governmental interests in restricting certain activities, such as local fisheries and coasting trade, to enrolled American vessels, and the documentation scheme entails reasonable means for advancing those interests. The documentation scheme would be quite impractical absent boarding authority. Moreover, the mobility of vessels and the enormous area over which they can operate suggest that boarding frequently will take place as a result of random encounters between vessels and the Coast Guard. A warrant requirement would have been totally unfeasible when the documentation scheme was first adopted by Congress in the late Eighteenth Century. *See* Act of Sept. 1, 1789, ch. XI, § 1, 1 Stat. 55. The defendants argue that today it is feasible to have a warrant issued ashore and executed on wireless instructions to the Coast Guard. But in the context of a documentation and main beam number inspection, imposing such a warrant requirement would not add significantly to the expectations of privacy of those on board a vessel unless the requirement was accompanied by some articulable standard as to when a magistrate could authorize such an inspection. That standard would, we think, be no different than the standard applicable to the Coast Guard officer at the scene, which we address in Part II D below. We conclude that the statute authorizing Coast Guard boardings for documentation and main beam number inspections without a warrant is not facially unconstitutional. Our holding in this respect is a narrow one. We have no occasion to consider whether section 89(a) is a valid authorization for warrantless boarding for other purposes, such as safety inspections and customs enforcement. Moreover, we hold that the statute is valid only insofar as it involves the limited invasion of expectations of privacy on a vessel which are necessary for documentation and main beam number examination. It is unnecessary to go further in this case, since at the time of discovery of the contraband the search itself had not done so.

## D.

### Standard for Selecting Targets

The defendants contend, however, that even if boarding at sea without a warrant for documentation and main beam number inspection is in some circumstances valid, the fourth amendment still imposes limits which in this case were exceeded.

At the time the actual boarding took place the Coast Guard officers had probable cause to believe a violation of the documentation laws was occurring, since neither the name KRISTEN JANE nor the home port was permanently affixed upon the vessel's stern. *See* 46 U.S.C. § 46. But defendants correctly point out that the apprehension for the purpose of boarding, which amounts to a seizure, took place when Lt. Olthuis ordered the KRISTEN JANE into calmer waters. At that time Lt. Olthuis had no probable cause to believe the vessel was improperly documented or identified. Moreover, there is no evidence that he was acting pursuant to any standard, guideline, or procedure promulgated by any superior authority, outlining the circumstances in which vessels could be stopped at sea for documentation verification. *See Marshall v. Barlow's, Inc.,* 436 U.S. 307, 320–21, 98 S.Ct. 1816, 1824–25, 56 L.Ed.2d 305 (1978). The defendants urge, therefore, that the seizure was invalid under *Delaware v. Prouse,* 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979), and *United States v. Brignoni-Ponce,* 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975).

In *Prouse* the Court held that random stops of motorists for the purpose of license and vehicle registration checks violated the fourth amendment in the absence of "at least articulable and reasonable suspicion that a motorist is unlicensed or that an automobile is not registered, or that either the vehicle or an occupant is otherwise subject to seizure for violation of law . . . ." 440 U.S. at 663, 99 S.Ct. at 1401. In *Brignoni-Ponce* the Court held that random stops of vehicles in areas near the international border violated the fourth amendment, except at the border and its functional equivalents, and where the border patrol agents "are aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion that the vehicles contain aliens who may be illegally in the country." 422 U.S. at 884, 95 S.Ct. at 2582 (footnote omitted). If these cases apply to vessel documentation stops, the governing standard for selection of a target vessel is an articulable and reasonable suspicion of a documentation violation.

The government urges that at sea it should not have to meet even the articulable and reasonable suspicion standard. Its argument is that the alternative to random stops, a roadblock-type stop, mentioned by the Court in *Prouse* as one permissible alternative, 440 U.S. at 663, 99 S.Ct. at 1401, is not a practical alternative at sea. But certainly there are alternatives other than unbridled discretion. *See* Note, *High on the Seas: Drug Smuggling, the Fourth Amendment, and Warrantless Searches at Sea*, 93 Harv.L.Rev. 725, 743–48 (1980) [hereinafter cited as *High on the Seas*]. This is particularly true in piloting waters such as Delaware Bay, where the movement of vessels is significantly restricted by natural barriers to navigation. We need not decide in this case, however, whether the fourth amendment permits unbridled discretion in the selection of vessels for a documentation search, for on this record, we hold, the articulable and reasonable suspicion standard is satisfied.

■ Lt. Olthuis observed a vessel of a size to which the documentation laws apply, with a South Carolina home port, proceeding inbound. Its speed suggested that it was not heading to port with a catch of fish. Moreover, it was headed in a direction where there were few facilities for processing fish. Its trawling gear was not of a type useful for commercial fishing in the vicinity of Delaware Bay. The trawl doors were lashed down and the rigging was in disrepair. Under these circumstances Olthuis could reasonably suspect that it might be engaged in some activity for which it was not properly documented. His selection of it, therefore, satisfied the *Prouse* and *Brignoni-Ponce* standard. He was justified in instructing the vessel to proceed to calm waters where a documentation inspection could take place. Once there, he had probable cause to believe there was a violation of 46 U.S.C. § 46.

The government urges that this seizure was justified on safety grounds as well. There is very little evidence, however, that when he instructed the KRISTEN JANE to proceed to calm waters Lt. Olthuis had any basis for an articulable and reasonable suspicion of any safety law violation. Since, for a documentation inspection, the seizure satisfied the articulable and reasonable suspicion standard, we have no occasion to address what circumstances would justify a more intrusive safety inspection.

E.

Pretext

■ The defendants urge that even if the standards of *Delaware v. Prouse* and *United States v. Brignoni-Ponce* were satisfied, the plain view fruits of the documentation verification should nevertheless be suppressed because documentation verification was a mere pretext for a criminal investigative search. Given the evidence about the EPIC check and the wireless conversations between the POINT FRANKLIN and the Cape May Coast Guard Station it is clear that Lt. Olthuis' interest in the KRISTEN JANE went beyond an inquiry as to its documentation. We assume, therefore, that

the interception of that vessel had at least a dual purpose. The trial court held that if the documentation verification purpose sufficed to justify the interception the criminal investigative purpose was irrelevant. We agree, at least in cases such as this one, in which the discovery of contraband is made in the course of an inspection no more intrusive of the normally concealed parts of the vessel than was necessary for such verification. The Coast Guard has responsibility for enforcement of the penal provisions of the customs law, but it also has responsibility for enforcement of the laws requiring vessel documentation. The existence of the first responsibility in no way diminishes the second, and a documentation verification inspection was made.

The defendants produced evidence in the suppression hearing of instructions issued to Coast Guard personnel to the effect that boardings for administrative inspections may often produce the opportunity for observation of concealed contraband. The evidence included typical or possible hiding places on various types of vessels, and directions that inspections for compliance with safety regulations be conducted in such a manner as to intrude into all these concealed spaces. The instruction is candid:

> As a general rule, no boarding should be conducted without the boarding officer knowing the specific purpose and authority prior to boarding the vessel. If this rule is carefully followed, most subsequent seizures of contraband when they occur should be valid and will be consistent with professional law enforcement practices. For example, as long as the Coast Guard can indicate that an initial boarding for administrative inspection was conducted in an unintrusive and un-

obtrusive manner, the courts are likely to sustain the initial search and any collateral searches it may have fostered.

Defendants' Exhibit DD–9 (par. 5e of Appendix III of Operation Plan). In this case that instruction was complied with up to the point at which the contraband was discovered. It is entirely possible that had the main beam number been discovered in the engine room before the hatch cover for the hold was removed the boarding officers would have proceeded with a far more intrusive bow to stern safety inspection. But such speculation about what might have been does not furnish grounds for suppression of evidence found in plain view in the course of a valid documentation verification inspection.

III.

Our holding is a narrow one. Where, as here, from circumstances such as the type and size of the vessel, the condition of its gear, its location, and its direction, a Coast Guard officer has an articulable and reasonable suspicion that the vessel may be engaged in activity for which it is not properly documented he may board the vessel for a document verification inspection. If in the course of an inspection no more intrusive than is reasonably necessary for such verification he observes contraband in plain view, seizure of the contraband is valid under the fourth amendment. Whether a more intrusive search for compliance with safety regulations or for compliance with the customs laws would be valid absent either probable cause or reasonable suspicion of violations need not be decided in this case.[4] The judgment will be affirmed.

4. The legitimate scope of Coast Guard boarding authority under section 89(a) is a matter of serious debate. *Compare United States v. Hilton*, 619 F.2d 127 (1st Cir. 1980); *United States v. Dominguez*, 604 F.2d 304, 309 n. 4 (4th Cir. 1979), *cert. denied*, 444 U.S. 1014, 100 S.Ct. 664, 62 L.Ed.2d 644 (1980); *United States v. Warren*, 578 F.2d 1058, 1064 -66 (5th Cir. 1978) (en banc); Carmichael, *At Sea With the Fourth Amendment*, 32 U. Miami L. Rev. 51 (1977); *with United States v. Williams*, 617 F.2d 1063 (5th Cir. 1980) (en banc); *United States v. Piner*, 608 F.2d 358 (9th Cir. 1979); *United States

v. Odneal*, 565 F.2d 598 (9th Cir. 1977), *cert. denied*, 435 U.S. 952, 98 S.Ct. 1581, 55 L.Ed.2d 803 (1978); *High on the Seas*. The application of the holdings in *Delaware v. Prouse*, 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660, *United States v. Brignoni-Ponce*, 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 and *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 98 S.Ct. 1816, 56 L.Ed.2d 305 to section 89(a) and other statutes such as 19 U.S.C. § 1581 authorizing customs searches presents questions of considerable complexity which should not be anticipated.