**UNITED STATES OF AMERICA, Plaintiff**
**v.**
**VARLACK VENTURES, INC., and HUBERT FREDERICKS,**
**Defendants**

No. 1996-229

**UNITED STATES OF AMERICA, Plaintiff**
**v.**
**CLIFTON ASHLEY BOYNES, SR., and INTERISLAND BOAT**
**SERVICES, INC., Defendants**

No. 1996-2

District Court of the Virgin Islands

Div. of St. Thomas and St. John

August 19, 1997

267

268

KIM CHISOLM, ESQ., and STANLEY DEJONGH, ESQ., St. Thomas, U.S.V.I., *for Plaintiff*

SAMUEL H. HALL, ESQ., St. Thomas, U.S.V.I. *for Defendants Boynes and Interisland Boat Service, Inc.*

CHARLES B. HERNDON, ESQ., St. Thomas, U.S.V.I., *for Defendant Fredericks*

ALAN D. SMITH, ESQ., St. Thomas, U.S.V.I., *for Defendant Varlack Ventures, Inc.*

MOORE, *Chief Judge*

## MEMORANDUM

### I. Facts

*A. United States v. Varlack Ventures, Inc. and Hubert Fredericks*

On March 26, 1995, the St. Thomas Coast Guard Marine Safety Detachment Office ["MSD"] received a telephone call reporting an oil spill in Red Hook Harbor on the east end of the island. A commissioned officer in the United States Coast Guard ["USCG"] was dispatched. He arrived at Red Hook at 11:35 A.M., and met with an employee of a marina, who brought the officer to the dock and pointed out a sheen where the oil spill had occurred. The officer took a sample of the sheen.

The officer spoke with a person who had witnessed the spill and advised it was the M/V Venture Pride which had discharged the

oil. The Venture Pride is a multipassenger vessel owned by Varlack Ventures, Inc. ["Varlack"], and is operated as a commercial ferry in the waters of the United States Virgin Islands and elsewhere under a certificate issued by the USCG. As the eye witness was giving a written statement, the Venture Pride returned and docked at the Red Hook ferry dock. The officer sketched the side of the Venture Pride and the witness noted on the diagram the opening from which the oil had been discharged.

The officer immediately boarded the Venture Pride and asked the crew to have the captain return to the ship. The Coast Guard officer was granted access to the engineroom, found oil in the bilge, and collected a sample. He then left the ship and proceeded in a dinghy with the first witness to take a sample from an overboard discharge fitting which had what looked like fresh oil on and around it. He also took photographs of the discharge fitting and the Venture Pride itself.

The officer re-boarded the vessel and spoke with Hubert Fredericks ["Fredericks"], the captain of the Venture Pride, with whom he was aquainted from previous USCG inspections. The officer handed Fredericks a letter of federal interest, which Fredericks signed. He also took statements from Fredericks about the incident, including statements that a spill may have occurred in Cruz Bay and that no reports had been made about any of the spills. On the spot, the officer revoked the Venture Pride's certificate of inspection, which effectively withdrew the ship's authority to carry passengers.

On March 27, 1995, the officer called Varlack Ventures and spoke with Captain Thomas ["Thomas"], told Thomas not to make any changes to the Venture Pride and advised Thomas that the Coast Guard would be photographing and collecting evidence on the Venture Pride on March 28, the next day. Having learned from Thomas where the Venture Pride was docked, the officer and a chief petty officer boarded the Venture Pride on March 28, 1995 and took video and still photos of the interior and the exterior of the ship.

An indictment was returned by the Grand Jury against Varlack Ventures and Hubert Fredericks for criminal violations of environmental statutes. Fredericks filed a motion to suppress (1) the

statements made by him on March 26, as taken in violation of *Miranda v. Arizona*, (2) statements of other crew members on March 26, also taken in violation of *Miranda*, (3) water samples and photographic evidence taken on March 26 on Fourth Amendment[1] grounds, and (4) photographic and video evidence taken on March 28, also on Fourth Amendment grounds. A hearing on the motion to suppress was held on April 11, 1997, at the close of which the Court dictated findings into the record. The Court has done further research and wishes to memorialize its findings in writing. To the extent that the findings of the Court in this Opinion differ from those dictated into the record on April 11, the findings in this Opinion are controlling.

### B. United States v. Clifton Ashley Boynes, Sr. and Interisland Boat Services

On February 1, 1995 at 6:00 A.M., Clifton Ashley Boynes, Sr. ["Boynes"], captain of the M/V Mona Queen and sole owner of Interisland Boat Services ["Interisland"], was at the Red Hook ferry dock preparing for his regular 6:30 A.M. trip to Caneel Bay. USCG officers present in Red Hook were seen and recognized by Boynes. Interisland operates an interisland ferry service in the waters of the United States Virgin Islands and elsewhere under a USCG certificate of authority.

Boynes boarded passengers and began his first ferry run. As he moved away from the dock, he was alerted by passengers that Coast Guard officers were in a dinghy along the starboard side of the Mona Queen. The officers retrieved a sample of oil and water which was being pumped from the starboard side discharge port of the Mona Queen. Due to mechanical problems with the dinghy, the officers backed off and returned to Red Hook instead of pursuing the Mona Queen.

Upon return to Red Hook after his run across Pilsbury Sound to Caneel Bay, St. John, U.S.V.I., Boynes received a three-page fax from the Coast Guard directing him to report to the United States

---

[1] The Fourth Amendment is made applicable to the Virgin Islands by Revised Organic Act of 1954 § 3; 48 U.S.C. § 1570. The Revised Organic Act of 1954 is found at 48 U.S.C. §§ 1541-1645 (1995), *reprinted in* V.I. CODE ANN., Historical Documents, 73-177 (codified as amended) (1995) ["Revised Organic Act"].

Coast Guard's Marine Safety Detachment Office ["MSD Office"] in Charlotte Amalie Harbor in St. Thomas at 1:00 P.M. that day for questioning. At 8:30 A.M., as Boynes continued to operate his ferry service and the Mona Queen, he encountered the officers at Red Hook, at which time they boarded and inspected the Mona Queen. They ascertained that a bilge pump was connected to the starboard discharge port from which the oil and water sample had been obtained earlier that morning. No water samples were taken of the bilge pump, however, because the officers did not have any clean sample jars with them. The Coast Guard revoked the Mona Queen's certificate of inspection and directed Boynes to have the boat repaired. They again ordered him to report to the MSD Office at 1:00 P.M. for questioning.

Boynes took the Mona Queen to a boat repair facility at Nanny Cay on Tortola, British Virgin Islands ["BVI"], for repairs, and then traveled to the MSD Office. In response to questioning by the Coast Guard, Boynes discussed the incident, gave a written statement and drew a diagram of the bilge system. When asked, Boynes stated that the Mona Queen had been taken to Tortola. The Coast Guard told him to cease all repairs and advised him that they would travel to Nanny Cay the next day to gather photographic and physical evidence. The next day, February 2, 1995, the Coast Guard went on board the Mona Queen at dry dock at Nanny Cay Marina. They took photographs and videos, made written notes and gathered samples from the bilge room. Neither Boynes nor anyone from Interisland Boat Services were present when the Coast Guard boarded the vessel in the British Virgin Islands.

The grand jury returned an indictment against Mr. Boynes and Interisland Boat Services. The defendants filed a joint motion to suppress Mr. Boynes' statements made at the MSD Office on February 1 because the USCG had violated his rights under *Miranda*, and to suppress all evidence and testimony resulting from the search of February 2, 1997, because the USCG violated the defendants' rights guaranteed by the Fourth Amendment. The Court held a hearing on this motion on January 15, 1997, and the parties have filed supplemental briefs. Since this motion to suppress presents many issues similar to those in Criminal No. 1996-229, both are addressed together in this Opinion.

## II. Discussion

### A. Miranda Claims

■ ■ Both Boynes and Fredericks have moved to suppress certain statements made to employees of the USCG due to alleged violations of the rule in *Miranda v. Arizona*, 384 U.S. 436 (1966). *Miranda* comes into play only in the context of custodial interrogation. As long as a person is not in custody, as that term is defined by the cases, she may be questioned about a criminal matter without first being advised of her *Miranda* rights. Whether a defendant was in custody at the time of questioning is determined on a case-by-case basis. *Patterson v. Cuyler*, 729 F.2d 925, 930 (3d Cir. 1984); *United States v. Mesa*, 638 F.2d 582, 584 (3d Cir. 1980). Absent a formal arrest, a person is in "custody" when the person's freedom of action has been restrained in some meaningful and significant manner. *Yount v. Patton*, 710 F.2d 956, 961 (3d Cir. 1983)("Something must be said or done by the authorities, either in their manner of approach, or in the tone or extent of their questioning which indicates that they would not have heeded a request to depart."), *rev'd on other grounds*, 467 U.S. 1025 (1984). The mere fact that a person is suspected by the police to have committed a crime does not automatically render any questioning 'custodial interrogation'. *Id*. at 960 ("It is police compulsion, and not the strength of police suspicions, which places a suspect in custody.").

■ The Court finds that the Coast Guard did not violate *Miranda's* strictures in their questioning of either Fredericks or Boynes. Fredericks was on the Venture Pride, and merely answered questions asked by the officers. At that stage, the USCG was engaged in a lawful administrative boarding and inspection authorized by 14 U.S.C. § 89(a), the scope of which will be discussed later. There is no evidence to even hint that Fredericks was restrained, coerced or even intimidated. He and the Coast Guard officer knew each other, and the Court finds that the questioning was not hostile or coercive in any way. The evidence presented is woefully insufficient to support a finding that a reasonable person would have felt that he was in custody or that he was not free to

leave. Since Fredericks was not in custody, the Coast Guard's questioning of him did not violate *Miranda*.

■ Fredericks has also moved to suppress the statements of the crew made on March 26. This must fail because the rights guaranteed by *Miranda* are personal rights, which may be claimed solely by the individual who is being questioned. *United States v. Sullivan*, 435 F.2d 650, 652 (9th Cir. 1970); *Byrd v. Comstock*, 430 F.2d 937 (9th Cir. 1970); *See also, United States v. Alderman*, 394 U.S. 165, 171-176 (1969) (constitutional rights may only be claimed by the person aggrieved.) Fredericks has no standing to make the claim that the *Miranda* rights of the crew were violated.[2]

The facts relating to the questioning of Boynes are slightly different. Boynes was commanded on two occasions to attend a meeting at the Coast Guard MSD Office, and, when he arrived, he was met and questioned in the company of at least three officers. Unlike Fredericks, however, Boynes was advised of his *Miranda* rights. The issue here is whether the Coast Guard followed the correct procedure when they read Boynes his rights. The parties differ whether the rights were read before or after the questioning began, although both sides agree that he was eventually given a full reading of his rights. The question is whether he was read his rights before the interrogation began.

The notes taken by the Coast Guard during the interview show that the questioning began at 13:25 (1:25 P.M.) Whereas the waiver of rights was signed by Mr. Boynes four minutes later at 13:29. The first notation on the notes, however, make it clear that Boynes was read his rights before he was questioned about the incident. From the testimony adduced at the hearing on January 15th, as well as the notes and the waiver, the Court concludes that the reading and waiving of rights began at approximately 13:25, and ended at approximately 13:29, when the formal questioning began. There-

---

[2]Even if Fredericks had standing to assert such a claim, the evidence in the record shows that the crew was not in custody, since their questioning was under the same circumstances as that of Fredericks. Therefore *Miranda* warnings were not required.

fore, there was no violation of *Miranda*, since he was read his rights before any questioning occurred.[3]

## B. The Fourth Amendment

The issue at the heart of both of these cases is the scope and effect of the Fourth Amendment's prohibition against unlawful searches and seizures in the context of so-called administrative inspections conducted by the USCG under the authority of 14 U.S.C. § 89(a). The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ." A person's Fourth Amendment right to be free from unreasonable searches is implicated when he or she (1) has "manifested a subjective expectation of privacy" in the place searched, which (2) "society accepts as objectively reasonable." *California v. Greenwood*, 486 U.S. 35, 39 (1988); *United States v. Cardona-Sandoval*, 6 F.3d 15 (1st Cir. 1993); *see also, O'Connor v. Ortega*, 480 U.S. 709, 715 (1987); *Katz v. United States*, 389 U.S. 347, 361 (1967)(Harlan, J., concurring).

Juxtaposed to the Fourth Amendment's protections is the wide-ranging authority of the Coast Guard under section 89(a), set out in the margin,[4] to conduct administrative safety and document inspections of vessels subject to the jurisdiction of the United States. Such administrative inspections are permissible even "without any particularized suspicion of wrongdoing." *United States v.*

---

[3] Boynes also asks that any statements made after his rights were read to him be suppressed also, as fruit of the initial *Miranda* violation. As the Court finds no initial violation, all claimed statements in question were lawfully obtained.

[4] In relevant part, 14 U.S.C. § 89(a) states:

The Coast Guard may make inquiries, examinations, inspections, searches, seizures, and arrests upon the high seas and waters over which the United States has jurisdiction, for the prevention, detection, and suppression of violations of the laws of the United States. For such purposes, commissioned, warrant, and petty officers may at any time go on board of any vessel subject to the jurisdiction, or the operation of any law, of the United States, address inquiries to those on board, examine the ships documents and papers, and examine, inspect and search the vessel and use all necessary force to compel compliance. When from such inquiries, examination, inspection, or search it appears that a breach of the laws of the United States rendering a person liable to arrest is being or has been committed, by any person, such person shall be immediately pursued and arrested on shore, or other lawful appropriate action shall be taken. . . .

This section was enacted by the First Congress as part of the Judiciary Act of 1789.

275

*Elkins*, 774 F.2d 530, 533-34 (1st Cir. 1985) (*quoting United States v. Burke*, 716 F.2d 935, 937 (1st Cir. 1983).

■ In attempting to reconcile these two fundamental provisions of federal law, the Court first notes that there is "no talisman that determines in all cases those privacy expectations that society is prepared to accept as reasonable." *O'Connor*, 480 U.S. at 715. The reasonableness of an expectation of privacy and the proper standard for a search vary according to context. *Id.* While "arcane distinctions developed in property and tort law" do not control the inquiry, *Rakas v. Illinois*, 439 U.S. 128, 143 (1978), courts consider such factors as ownership, possession, control, ability to exclude from the premises, or an authorized presence on the premises when determining the existence of a legitimate expectation of privacy. *United States v. Brown*, 3 F.3d 673, 683 (3d Cir. 1993); *United States v. Acosta*, 965 F.2d 1248, 1256 (3d Cir. 1992). In addition, because of the "circumstances and exigencies of the maritime setting," courts have held that individuals generally have a diminished expectation of privacy on a vessel as opposed to that which they expect in their home. *See, e.g., United States v. Demanett*, 629 F.2d 862, 867 (3d Cir. 1980); *United States v. Green*, 671 F.2d 46, 53 (1st Cir.), *cert. denied*, 457 U.S. 1135 (1982); *United States v. Hilton*, 619 F.2d 127, 131 (1st Cir.), *cert. denied*, 449 U.S. 887(1980). Finally, just as was discussed in the context of *Miranda*, "Fourth Amendment rights are personal rights which . . . may not be vicariously asserted." *Alderman v. United States*, 394 U.S. 165, 174 (1969).

1. Standing

■ In order to assert a violation of the Fourth Amendment, the defendant must have standing, which is another way of saying that he must have a reasonable expectation of privacy in the area searched or the matter seized. *Rakas v. Illinois*, 439 U.S. 128 (1978). The owning corporate defendants, Varlack and Interisland, clearly have privacy interests in their respective boats, and therefore have standing to claim the protection of the Fourth Amendment. Boynes, as the sole-owner of Interisland, also has standing. Fredericks, however, is not an owner of Varlack or the Venture Pride and the Court must first determine whether his status as a

captain of the Venture Pride is sufficient to embue him with standing to challenge a search of that boat.

■ Courts have found that the captain of a ship has a cognizable expectation of privacy from law enforcement entry onto his ship. This interest derives from his custodial responsibility for the ship, his associated legal power to exclude interlopers from unauthorized entry to particular places on board, and the doctrine of admiralty which grants the captain the same basic interest in the vessel as its owners. *See, e.g., The Styria,* 186 U.S. 1 (1902); *Coastal Iron Works, Inc. v. Petty Ray Geophysical,* 783 F.2d 577, 582 (5th Cir. 1986); *United States v. Aikens,* 685 F.Supp. 732, 736 (D. Hawaii 1988), *rev'd on other grounds,* 946 F.2d 608 (9th Cir. 1990). Under this theory, Fredericks' privacy expectation as captain of the Venture Pride should be viewed separately from that of others onboard, such as the crew, for example. When the vessel is detached from the dock and on the waters, the captain is the focal point of leadership, and all control, regulation and discipline. In this regard, he is the final and ultimate authority for direction, guidance and responsibility on the ship. He is responsible for all activities undertaken by the crew and vessel. This concept of total control is the source of the captain's privacy expectation. Exclusive control and privacy generally go hand-in-hand. *See, e.g., U.S. v. Massell,* 823 F.2d 1503, 1507 (11th Cir. 1987); *U.S. v. Pollock,* 726 F.2d 1456, 1465 (9th Cir. 1984); *U.S. v. Bachner,* 706 F.2d 1121 (11th Cir. 1983); *U.S. v. Garcia,* 598 F.Supp. 533, 536 (S.D.Fla.1984). Thus, in his capacity as master, the captain of a ship has a Fourth Amendment right to challenge searches of his vessel. *See also United States v. Manbeck,* 744 F.2d 360, 380 (4th Cir. 1984); *United States v. Marrero,* 644 F.Supp. 570, 574 (S.D. Fla. 1986). The Court thus holds that Mr. Fredericks, as well as the other three defendants in these cases, have standing to challenge the searches on Fourth Amendment grounds. Three have ownership interests, and the other is a captain of the ship involved.

2. Expectations of Privacy

The general expectation of privacy sufficient to confer standing however, only marks the beginning if the inquiry. The next question is whether the defendants possessed a reasonable expec-

tation of privacy which was violated by the searches performed by the Coast Guard.

■ Of course, the privacy expectations of the captain are subject to the Coast Guard's authority to conduct document and safety inspections and its limited power to search more intrusively upon reasonable suspicion. But this is not inconsistent with recognizing that the captain still retains privacy interests that go beyond his person and personal belongings. Rather, it means that in determining what is reasonable behavior by officials, there is a latitude that reflects the mobility of the vessel, the special dangers of sea travel and other considerations peculiar to such travel. That latitude is not unlimited and we turn now to the question whether in this case the USCG overstepped that boundary.

### C. 18 U.S.C. § 89(a)

■ The Coast Guard's authority under § 89(a) to stop and board a United States vessel on the high seas is quite broad. No particularized suspicion of wrongdoing is needed for an administrative safety and document inspection. *United States v. Elkins*, 774 F.2d 530, 533-34 (1st Cir. 1985) (*quoting United States v. Burke*, 716 F.2d 935, 937 (1st Cir. 1983)). Despite this empowerment, the Fourth Amendment still prohibits the USCG from conducting unreasonable searches and seizures. The reasonableness of any search depends first on "whether the . . . action was justified at its inception," *Terry v. Ohio*, 392 U.S. 1, 20 (1968), and second on whether the search actually conducted "was reasonably related in scope to the circumstances which justified the interference in the first place." *Id.; see also New Jersey v. T.L.O.*, 469 U.S. 325, 341 (1985).

Because of the special conditions under which searches and seizures of vessels are usually conducted while at sea, courts have recognized a diminished expectation of privacy. *Green*, 671 F.2d at 53; *Hilton*, 619 F.2d at 131. Obviously, the federal requirements of documentation of ownership and compliance with safety regulations would not be enforceable without some boarding authority. Still, the plenary authority to board and inspect, conferred on the Coast Guard by § 89(a), must be measured against the requirements of the Fourth Amendment, for "no Act of Congress can authorize a violation of the Constitution." *Almeida-Sanchez v.*

*United States*, 413 U.S. 266, 272 (1973). *See also United States v. Demanett*, 629 F.2d 862, 867 (3d Cir. 1980). The Court of Appeals for the Third Circuit has held that a warrant is not required to perform a document search under 89(a). *Demanett* at 867. In *Demanett*, the court specifically declined to address several of the issues presented in this case, including the circumstances in which a safety inspection may blossom into a full-scale search. Also, multiple searches were not there at issue.

On its face, § 89(a) gives the USCG virtually unlimited authority to conduct administrative searches of vessels in order to determine ownership and observance of safety standards. Section 89(a), however, cannot be used by itself as an investigative tool to pursue criminal charges. In other words, while § 89(a) allows the USCG to conduct administrative searches, it does not otherwise modify the requirements of the Fourth Amendment regarding searches, seizures and warrants. Overlaying the literal reading of § 89(a) with the strictures of the Fourth Amendment necessarily implies a gradual escalation of governmental intrusion into privacy: a document and safety inspection could provide reasonable suspicion for further investigation, which in turn might uncover probable cause for a complete warrantless search and, perhaps ultimately, a seizure. The statute provides the Coast Guard enormous power to inspect and investigate without the necessity of obtaining a search warrant. *See Demanett* at 867. Such far-reaching authority to invade the privacy of citizend is permissible, however, only if the stop and boarding is for the administrative purpose of a bona fide document and safety inspection. *See, e.g. Demanett* at 867; *United States v. Cilley*, 785 F.2d 651 (9th Cir. 1985); *United States v. Jonas, supra*; *United States v. Williams, supra*; *United States v. Bent, supra*; *United States v. Humphrey*, 759 F.2d 743 (9th Cir. 1985); *United States v. Piner*, 608 F.2d 358 (9th Cir. 1979); *United States v. Ricardo, supra*; *United States v. Hilton*, 619 F.2d 127 (1st Cir.), *cert. denied*, 449 U.S. 887 (1980); *United States v. Harper, supra*; *United States v. Peterson, supra*; and *United States v. Postal*, 589 F.2d 862 (5th Cir. 1979).

■ Accordingly, courts require that the Coast Guard possess "reasonable and articulable grounds for suspecting that the vessel or those on board are engaging in criminal activities" before conducting a thorough search beyond checking for compliance

with document and safety regulations. *Green*, 671 F.2d at 53 (*citing United States v. Williams*, 617 F.2d 1063, 1076, 1084 (5th Cir. 1980)). The necessary "reasonable suspicion" may be formed on the basis of facts obtained during the safety and document inspection, and once reasonable suspicion exists the inspecting officers may increase the scope and intrusiveness of their search. *Elkins*, 774 F.2d at 534. Both the document and safety inspection, and a search pursuant to reasonable suspicion, must be confined to areas reasonably incident to the original purpose of the inspection, since reasonable suspicion still only authorizes a search of limited intrusion. For example, if an administrative inspection of a particular area of a vessel raises a reasonable suspicion, then the area to be investigated may be expanded consistently with the nature of the information giving rise to the reasonable suspicion. *Id.* (suspicious fuel tank); *see also Lopez*, 761 F.2d at 636. Neither an administrative inspection nor a reasonable suspicion provides carte blanche to search the entire vessel. *See Hilton*, 619 F.2d at 132 (discussing scope of document and safety inspection). Only a search based on probable cause can be so intrusive as effectively to destroy the boat. *Lopez*, 761 F.2d at 636-37; *United States v. Andreu*, 715 F.2d 1497 (11th Cir. 1983).

 In the maritime context, therefore, the relative intrusiveness of a search must be justified by a corresponding level of suspicion supported by specific facts gathered by the investigating officials. *Cf. New Jersey v. T.L.O.*, 469 U.S. at 343-44, 347 (contemplating expanding scope of search where justified by facts giving rise to further reasonable suspicion); *United States v. Villamonte Marquez*, 462 U.S. 579, 592 (1983). One of the limits on this progression is the restriction on the scope of the area searched inherent in the expectation of privacy encompassed in the standing doctrine. Thus, if a document and safety inspection causes a Coast Guard officer to have reasonable suspicion to search a certain area of the boat, and that search yields nothing, then there is no basis to extend the scope of the search any farther. *Cf. Mincey v. Arizona*, 437 U.S. 385, 393 (1978) ("warrantless search must be 'strictly circumscribed by the exigencies which justify its initiation'") (citation omitted).

280

■ Thus, the Fourth Amendment protects unreasonable "invasion of (one's) indefeasible right of personal security, personal liberty and private property." *Boyd v. U.S.*, 116 U.S. 616, 630 (1886). It protects people in their reasonable expectations of privacy, not places. *Katz v. U.S.*, 389 U.S. 347, 351 (1967). The Coast Guard activity is judged by balancing the intrusion on the individual's Fourth Amendment interests against the promotion of legitimate governmental interest. *U.S. v. Humphrey, supra; U.S. v. Villamonte-Marquez, supra.* "The greater the intrusion, the greater must be the reason for conducting a search that results in such invasion." *U.S. v. Afanador,* 567 F.2d 1325, 1328 (5th Cir. 1978). Administrative stops for document and safety inspections are generally viewed as reasonable and "minimal intrusions" when the intrusion is balanced against the strong governmental interest of safety concerns and proper vessel registration and documentation. *U.S. v. Humphrey, supra; U.S. v. Cilley, supra; U.S. v. Hilton, supra.* An administrative inspection without suspicion of wrongdoing is viewed as reasonable, because it is morally neutral, *U.S. v. Williams, supra,* provided such inspection is not a pretext to search for contraband or other evidence of criminal wrongdoing. *U.S. v. Jonas, supra.*[5]

This discussion addresses the constitutional limitations on administrative searches and seizures where the purpose has extended beyond the administrative, and restricts the authority granted to the Coast Guard in § 89(a). While it is clear in both cases under consideration that the Coast Guard was entitled initially to board the vessels and perform administrative inspections, the subsequent boardings are in question.

*D. The Initial Boarding of the Venture Pride and the Mona Queen*

■ Coast Guard officers boarded the Venture Pride on March 26, spoke to the captain and the crew, and performed an administrative search. The Court has no difficulty concluding that the

---

[5] Of course, if the law enforcement officer is lawfully aboard the vessel and sees contraband in plain view, (*United States v. Green*, 671 F.2d 46 (1st Cir.) *cert. denied*, 457 U.S. 1135 (1982); *United States v. Hilton, supra*), or smells contraband (*United States v. Cilley, supra; United States v. Reeh,* 780 F.2d 1541 (11th Cir. 1986)), the search of the vessel may be expanded beyond the ambit of an administrative inspection. *United States v. Jonas, supra.*

Coast Guard had the authority to do so under § 89(a) as a safety inspection. Once on board, the Coast Guard saw the oil in the bilge area, took samples, and canceled the boat's certificate of inspection. As was discussed earlier, what begins as an administrative search may lead to reasonable suspicion and probable cause, allowing the search to intensify. Certainly, the actions of the Coast Guard on March 26, 1995 were justified.

The Coast Guard contacted Boynes by fax on February 1, 1995, instructing him to come to their office at 13:00. In the meantime, they met up with him at approximately 8:30 A.M. and boarded the Mona Queen with his permission. Once on board, they found considerable amounts of oil, and revoked the boat's certificate of inspection. Once again, there is nothing unlawful about the Coast Guard's activity on this date in regard to this search of the vessel. Section 89(a) allows such administrative searches. In addition, Boynes gave the Coast Guard permission to come on board. Clearly then, the Coast Guard officers acted within their authority in boarding the Mona Queen on February 2.

*E. The Subsequent Boardings of the Venture Pride and the Mona Queen*

■ In both cases, subsequent to the removal of the certificates of inspection, the Coast Guard performed more thorough searches and took photographic and physical evidence from the vessels. While § 89(a) implies authority for escalation of intrusion upon discovering conditions creating reasonable suspicion and probable cause, it does not authorize a later search of a vessel once the purpose of the § 89(a) administrative inspection is satisfied. When the Coast Guard removed the certificates of inspection from the vessels, the need for any administrative stop and inspection was removed. Although reasonable suspicion or probable cause may have existed to extend and intensify their searches during the initial boardings of the Venture Pride and Mona Queen, the Coast Guard elected not to do so. Having terminated their inspections and accomplished the purpose of those initial boardings, the Coast Guard lost any authority under § 89(a) to conduct additional administrative inspections of the Venture Pride and the Mona

Queen relating to the activity which caused revocations of their certificates of inspection.[6]

Although the Coast Guard had removed the certificate of inspection from the Venture Pride on March 26, officers boarded and searched her on March 28. Although the Coast Guard removed the certificate of inspection from the Mona Queen on February 1, officers traveled the next day to Tortola to board and search her. At the time of these second searches, the vessels had essentially been removed from service. There was no need to perform an administrative search to examine the ships' registration or to perform a safety inspection. The Coast Guard knew who owned the ships and knew where they were registered and had already found the vessels to be unsafe.

The only conceivable purpose for performing these second searches was to gather evidence either for civil litigation or criminal prosecution. The Coast Guard obviously recognized the possibility of instituting a criminal proceeding against Mr. Boynes, since they read him his rights before questioning him. While Mr. Fredericks was not read his rights, it is equally clear that the second search of the Venture Pride, just like the second search of the Mona Queen, was investigative and not administrative. Neither the statute nor the case law supports a finding that the Coast Guard is immune from the restrictions of the Constitution. Although the Coast Guard might have been justified in further investigating at the time of the initial searches of each vessel, this justification did not continue once the purpose of the administrative boarding and inspection under section 89(a) had been satisfied. Under *Terry v. Ohio*, a limited stop must either escalate quickly to a full-scale search, or it must terminate. A stop may not be used to justify a second search separated by both time and distance. *See Terry v. Ohio*, 391 U.S. 1 (1968); *Florida v. Royer*, 460 U.S. 491 (1983); *United States v. Sharpe*, 470 U.S. 675 (1985). Although the Supreme Court decisions have not articulated a precise time-frame for such

---

[6]Later administrative inspections would undoubtedly be in order once the vessels have been repaired and before they could be placed back in service. The above discussion obviously has no reference to much later inspections based on a new administrative purpose.

investigative stops, the case law clearly rejects anything more than a reasonable duration, which was exceeded for both second searches.

■ In both cases, the government has produced evidence that Coast Guard officers told the defendants that they would be performing these second searches. There is no indication that the Coast Guard asked or obtained permission to do so, however. Simply informing a defendant that the searches would take place is not the equivalent of gaining his consent. The officers told the defendants that they would be conducting the search, without giving them a choice to consent. Clearly, the Coast Guard cannot justify the search by claiming the defendants consented, when no such consent was ever requested or given. *See, e.g., Schneckloth v. Bustamonte*, 412 U.S. 218 (1973); *Bumper v. North Carolina*, 391 U.S. 543 (1968).

The Government has also attempted to justify the second searches on the basis of exigency. While exigency may in certain cases justify searches without warrants, these cases are not of that type. In both of these cases, the Coast Guard was lawfully on board each vessel during an initial inspection and chose to discontinue a search incident to that inspection. Obviously, Congress recognized in enacting § 89(a) that exigency might exist, and therefore allowed for administrative searches without a finding of probable cause. Here, any exigency passed once the vessels were initially boarded, their certificates revoked, and they were taken out of service. In both cases, the ships were at dry dock, without certificates of inspection. The government has produced no evidence that there was any exigency justifying subsequent warrantless searches. In the case involving the Mona Queen, the Coast Guard actually ordered that the boat be repaired. The government cannot order that repairs be done, and then use such repairs as a source of exigency allowing a warrantless search.

■ The government has also argued that obtaining a warrant would have been meaningless for the purpose of executing it in Tortola. This objection misses the point entirely. The warrant process is designed to ensure that the rights of American citizens to be free from unlawful searches and seizures is protected. The

defendants were entitled to a determination by a magistrate of the United States that probable cause existed before the government of the United States conducted a search in order to seize evidence which would be used against them in a United States Court. The recognition or not of such a warrant by the government of the British Virgin Islands has no bearing on the protection of the defendants' rights in courts of the United States.

## III. Conclusion

The Court finds that neither Fredericks nor Boynes has proved that their rights under *Miranda* were violated, and therefore their statements will not be suppressed. All defendants have standing to challenge the searches of the vessels, as they are either owners or captains, or both. The initial searches of the vessels were lawful under 14 U.S.C. § 89(a), so any evidence gathered on February 1 or March 26 will not be suppressed. The subsequent searches, conducted on February 2 and March 28, however, were authorized neither by § 89(a) nor the Constitution, and therefore any evidence seized on board as a result of these searches will be suppressed. Since the Coast Guard lacked legal authority to board the Mona Queen on February 2 and the Venture Pride on March 28, any evidence collected while on board, including photos, videos, samples, and testimony of what was observed while on board must be suppressed. Any evidence which was collected from the outside before and after these second boardings, such as photos and videos of the external parts of the ships, was not unlawfully collected, and need not be suppressed.

 As a matter of procedure, the Court notes that this opinion comes well after the hearings on the motions in these cases. This additional time will be excluded from the computation under the Speedy Trial Act for both cases. *See* 18 U.S.C. § 3161. Such a ruling is equitable considering that further deliberations by the Court resulted in a more favorable decision for the defendants than the Court's preliminary ruling announced from the bench. Accordingly, the time taken by the Court to reach this decision will not be considered for the purposes of the Speedy Trial Act.

ENTERED this 19th day of August, 1997.

## ORDER

For the reasons dictated into the record by the Court at the conclusion of the hearing, it is hereby

ORDERED that defendant Hubert Fredericks' motion to suppress photographic and video evidence collected on March 28, 1995 and is GRANTED AS DELINEATED IN THE ACCOMPANYING MEMORANDUM. It is also

ORDERED that defendant motion to suppress photographic and video evidence collected on February 2, 1995 filed by Clifton Ashley Boynes, Sr. and Varlack Ventures, Inc. is GRANTED AS DELINEATED IN THE ACCOMPANYING MEMORANDUM. It is also

ORDERED that defendant Hubert Fredericks' motion to suppress statements of other crew members, water samples, and the photos taken on March 26, 1995 is DENIED DUE TO LACK OF STANDING. It is further

ORDERED that defendant's motion to suppress his statements made on March 26, 1995 for *Miranda* violations is DENIED ON THE GROUNDS THAT HE WAS NOT IN CUSTODY. It is further

ORDERED that the time during which this opinion was considered is EXCLUDED from computations under the SPEEDY TRIAL ACT.

ENTERED this 19th day of August, 1997.