**UNITED STATES of America,
Appellant,**

v.

**Albert GREEN, et al., Defendants,
Appellees.**

**No. 81–1281.**

United States Court of Appeals,
First Circuit.

Argued Oct. 6, 1981.

Decided Feb. 19, 1982.

Certiorari Denied June 21, 1982.
See 102 S.Ct. 2962.

---

**48**

John H. LaChance, Asst. U. S. Atty., Boston, Mass., with whom Edward F. Harrington, U. S. Atty., Boston, Mass., was on brief, for appellant.

John Kenneth Zwerling and Marvin Miller, with whom Michael S. Lieberman, Zwerling & Shapiro, P. C., Alexandria, Va., Jay Colangelo, Stanton, Cal., and Ronald Chisholm, Boston, Mass., were on brief, for appellees.

Before COFFIN, Chief Judge, CAMPBELL, Circuit Judge, and WYZANSKI,* Senior District Judge.

LEVIN H. CAMPBELL, Circuit Judge.

On August 11, 1980, the Coast Guard cutter Reliance encountered the Persistence, a 52–foot sloop flying a British flag, on the high seas, 55 miles east of Provincetown, Massachusetts. Several factors made the captain of the Reliance suspicious of the Persistence, and he eventually asked for and received British consent to board the vessel. A boarding party went to the Persistence. When they opened the main hatch to go below in order to verify the vessel's "main beam" (registration) number, they discovered that the lower compartment was filled with bales of what turned out to be marijuana, five tons in all. The members of the crew, all United States citizens, were arrested and are the defendants-appellees in this action. The Persistence was seized and brought to Boston.

The defendants were charged with conspiracy to import marijuana, in violation of 21 U.S.C. §§ 952(a), 963, and conspiracy to possess marijuana with intent to distribute, in violation of 21 U.S.C. §§ 841(a)(1), 846. The defendants moved to suppress the marijuana, and a hearing was held. The district court originally denied the motion but on reconsideration after further hearing, granted the motion to suppress on the ground that the warrantless search below decks violated the fourth amendment. The government appeals pursuant to 18 U.S.C. § 3731. We reverse.

## I. THE FACTS

The Reliance initially encountered the Persistence early on the morning of August 11, 1980. She was moving sluggishly and appeared lower in the bow than normal. These facts indicated that she was probably carrying something heavy on board. The vessel was listed under "category 3" by the Drug Enforcement Agency's El Paso Intelligence Center, meaning that she is suspected of illegal activities and should be boarded if possible.

The Reliance attempted to contact the Persistence, but no one answered for two hours, although a man was seen in the cockpit. A man finally answered and identified himself as "Charles Daniels" (it was later discovered that no one by that name was on board). He said the vessel was the Persistence, her home port was Guernsey, her last port had been Bermuda, and her

---

\* Of the District of Massachusetts, sitting by designation.

next port was Portland, Maine. "Daniels" expressed interest in a hurricane he said was in the area they had just left; the captain of the Reliance (Commander Bates) thought this unusual, as the hurricane was in the Caribbean, not near Bermuda.

Bates contacted his operational commander and asked him to contact the British government to ask permission to board. He requested permission to board from "Daniels," who refused. The U.S. State Department then sought permission to board from the British government. That afternoon, the State Department received a telegram from the U.S. Embassy in London, stating that the British authorities were "nearly certain" the Persistence was of U.K. registry, but to confirm it, the "carved in the beam" number should be checked. More importantly, it further stated that "the U.K. authorities have granted authority to board and search subject vessel."

At 3:00 p. m. on August 11, Bates was informed of the British consent and told to board the vessel for purposes of determining and verifying its registration and determining the nationality of the persons on board. Bates informed the Persistence of the British consent; one of the defendants replied, "Fine, come aboard," and an armed boarding party was sent over. Bates instructed them to check the registration number and verify it by locating the main beam number. The defendants—the only persons on board—presented their identification to the boarding party, as well as the vessel's papers, and a provisional U.K. registration (the vessel had earlier been registered in the United States). When asked to point out the main beam number, defendant Kincaid indicated a board on deck and then pointed to some seat cushions. It was not in either of these places, and indeed, it was

unreasonable to think it could be, as the number is always placed on a permanent structural part of the vessel. Kincaid repeatedly said that it was not below deck, but when told that the boarding party would have to go below to find the number, he assented.[1] He then slid open the hatch, and said, "Looks like we've made history."

When the hatch was opened, plastic and burlap wrapped bales were visible, filling the lower compartment to within three feet of the overhead. The smell of marijuana was present. A search was made for the main beam number, but it could not be found. A bale was opened and tested positively as marijuana. Another search eventually revealed a main beam number, which was the number of the vessel's previous U.S. registry. The number would not have been visible from on deck.

Defendants argue that the Coast Guard's boarding and subsequent search of the Persistence violated a treaty, the Convention on the High Seas, *opened for signature* April 28, 1958, 13 U.S.T. 2312, T.I.A.S. No. 5200 (entered into force Sept. 30, 1962),[2] was not authorized by any federal statute, and violated the fourth amendment. For these reasons, they say, the evidence discovered on board was properly suppressed.

## II. CONVENTION ON THE HIGH SEAS

Turning first to the alleged treaty violation, we agree with the district court that the consent of the British government vitiated any violation of the Convention. Article 6 of the Convention on the High Seas provides *inter alia* that a vessel on the high seas is under the exclusive jurisdiction of the nation under whose flag she sails.[3] The

---

1. The district court originally found that Kincaid had consented to the search, but on reconsideration and after a further evidentiary hearing, it vacated this finding.

2. Both the United States and Great Britain are signatories to this treaty.

3. Article 6 provides in pertinent part that
   1. Ships shall sail under the flag of one State only and, save in exceptional cases

expressly provided for in international treaties or in these articles, shall be subject to its exclusive jurisdiction on the high seas. . . .
Defendants also contend that Article 22 was violated. It provides in pertinent part that
   1. Except where acts of interference derive from powers conferred by treaty, a warship which encounters a foreign merchant ship on the high seas is not justified in boarding her

unauthorized interference with a vessel by a foreign state is prohibited by Article 6 unless it comes within a recognized exception. Defendants·argue that the boarding of the Persistence violated Article 6.

As a preliminary matter, we face the question whether Article 6 is "self-executing": that is, whether it has become part of our domestic law enforceable by private individuals without separate legislation. *See Whitney v. Robertson*, 124 U.S. 190, 194, 8 S.Ct. 456, 458, 31 L.Ed. 386 (1888). If so, its violation would prevent our courts from exercising jurisdiction over the vessel and would provide a basis for suppression of evidence discovered during an unlawful seizure. *See Cook v. United States*, 288 U.S. 102, 53 S.Ct. 305, 77 L.Ed. 641 (1933); Riesenfeld, *The Doctrine of Self-Executing Treaties and U. S. v. Postal: Win at Any Price?* 74 Am.J.Int'l L. 892, 894 (1980).[4] If Article 6 is not self-executing, on the other hand, evidence seized in violation of it would not have to be suppressed, because no legislation has been passed to make it part of "the Law of the Land" within the meaning of the Constitution. U.S.Const. Art. VI, cl. 2.

■ Whether Article 6 is self-executing is a difficult issue. The Fifth Circuit, in what is apparently the only case to address the issue directly, has held that it is not self-executing. *See United States v. Postal*, 589 F.2d 862 (5th Cir.), *cert. denied*, 444 U.S. 832, 100 S.Ct. 61, 62 L.Ed.2d 40 (1979). Several commentators have expressed the opposite view. *See* Riesenfeld, *supra*; Note, *"Smoke on the Water": Coast Guard Authority to Seize Foreign Vessels Beyond the Contiguous Zone*, 13 N.Y.U.J. Int'l L. & Pol. 249, 302–16 (1980) [hereinafter cited as Coast Guard Authority]; Comment, *Treaties—Article 6 of the Convention on the High Seas is Not Self-Executing*, 55 Notre Dame Law. 292 (1979); Comment, *United States v. Postal, Lost on the High Seas*, 31 Mercer L.Rev. 1081 (1980). We do not reach this issue, however, because even assuming *arguendo* that Article 6 is self-executing, it was not violated in this case because the British government consented to the boarding.[5]

■ Great Britain's consent waived its rights under Article 6. Given this waiver, the individuals on board the vessel cannot successfully argue that the treaty was violated. While we are not aware of any other court decision clearly disposing of this·issue in a holding, other courts have implicitly recognized the correctness of this position,

---

unless there is reasonable ground for suspecting:

(a) That the ship is engaged in piracy; or

(b) That the ship is engaged in the slave trade; or

(c) That, though flying a foreign flag or refusing to show its flag, the ship is, in reality, of the same nationality as the warship.

. . . .

This article, however, does not function as a separate prohibition of interference. Rather, it specifies some of the "exceptional cases expressly provided for ... in these articles" which are exempted from the prohibition of Article 6. *See United States v. Williams*, 617 F.2d 1063, 1076 (5th Cir. 1980) (en banc); Note, *Coast Guard Authority, infra*, 13 N.Y.U.J. Int'l L. & Pol. at 255 n.24. Defendants are therefore incorrect in maintaining that Article 22 provides a separate ground for holding the boarding illegal.

4. *Cook* is an exception to the *Ker-Frisbie* doctrine that the illegal arrest of a defendant does not deprive the courts of jurisdiction. *Frisbie v. Collins*, 342 U.S. 519, 72 S.Ct. 509, 96 L.Ed. 541 (1952); *Ker v. Illinois*, 119 U.S. 436, 7 S.Ct. 225, 30 L.Ed. 421 (1886); *see Autry v. Wiley*,

440 F.2d 799, 801–02 (1st Cir.), *cert. denied*, 404 U.S. 886, 92 S.Ct. 219, 30 L.Ed.2d 169 (1971). The exception arises when the United States undertakes through a treaty to limit its own authority to seize a vessel. *See Cook*, 288 U.S. at 121, 53 S.Ct. at 312.

5. Defendants claim that the telegram from the U.S. Embassy which stated that "the U.K. authorities have granted authority to board and search subject vessel" was hearsay and was not admitted for its truth but only to show the fact of the communication. But the district court found that it was admissible for its truth under Fed.R.Evid. 803(24) and relied on it as evidence of the British consent. Moreover, the transcript indicates that the defendants' objection to the telegram was not directed to the consent portion but to the part dealing with the identification number.· The telegram was therefore properly admitted, and properly relied upon, as proof of British consent to the boarding. There is nothing in the record suggesting that the British may not in fact have consented.

and commentators have explicitly endorsed it. *See United States v. Dominguez,* 604 F.2d 304, 308 (4th Cir. 1979), *cert. denied,* 444 U.S. 1014, 100 S.Ct. 664, 62 L.Ed.2d 644 (1980); *United States v. Williams,* 617 F.2d 1063, 1075, 1090 (5th Cir. 1980) (en banc); *id.,* at 1092 (Roney, J., specially concurring); Riesenfeld, *supra,* at 903 n.56; *Coast Guard Authority, supra,* at 328 ("As long as the flag state consents expressly to Coast Guard searches of its vessels, ... [subsequent] seizures do not violate article 6, because the rule of noninterference is not breached when the foreign flag state vessel receives permission from the state whose ship it searches."); *see also United States v. Conroy,* 589 F.2d 1258, 1268 (5th Cir.), *cert. denied,* 444 U.S. 831, 100 S.Ct. 60, 62 L.Ed.2d 40 (1979); *United States v. Rubies,* 612 F.2d 397, 403 (9th Cir. 1979), *cert. denied,* 446 U.S. 940, 100 S.Ct. 2162, 64 L.Ed.2d 1174 (1980). The practice of obtaining prior consent of the foreign flag state is apparently a fairly common one, *see United States v. Streifel,* 665 F.2d 414, at 417 (2d Cir. 1981); *United States v. May May,* 470 F.Supp. 384, 388 (S.D.Tex.1979); Riesenfeld, *supra,* at 903 n.56; *Coast Guard Authority, supra,* at 330, and we see nothing to suggest that it is improper. The policy behind Article 6 is that of ensuring freedom of access to the high seas by preventing arbitrary interference with vessels of one state by those of another. *See* M. McDougal and W. Burke, *The Public Order of the Oceans,* 869–75 (1962). Permitting the flag state to authorize boarding by a foreign vessel in no way interferes with this policy; indeed, it can only further the recognition in Article 6 of the flag state's ability to exercise authority over its vessels.[6]

## III. STATUTORY AUTHORITY

As the boarding of the Persistence did not violate the Convention on the High Seas, we turn next to the issue of the Coast Guard's Authority under United States law to board and search. We find such authority in various provisions of the Anti-Smuggling Act of 1935, Aug. 5, 1935, c. 438, 49 Stat. 517 *et seq.,* codified at 19 U.S.C. §§ 1701–1711, and amending other sections of titles 19 and 46; *see* note to 19 U.S.C. § 1711.

We begin with 19 U.S.C. § 1581(h), which recognizes that a foreign government may agree to a boarding and search that would otherwise be in violation of a treaty:

(h) The provisions of this section shall not be construed to authorize or require any officer of the United States to enforce any law of the United States upon the high seas upon a foreign vessel in contravention of any treaty with a foreign government enabling or permitting the authorities of the United States to board, examine, search, seize, or otherwise to enforce upon said vessel upon the high seas the laws of the United States *except as such authorities are or may otherwise be enabled or permitted under special arrangement with such foreign government.* [Emphasis added.]

Britain's consent here constituted just such a "special arrangement."[7] *See United States v. Dominguez,* 604 F.2d at 308. As we have made clear *supra,* the Convention on the High Seas permits boardings when

---

6. While we think it clear that Article 6 implicitly recognizes that the flag state may authorize boardings as an incident of its jurisdiction, we also interpret Article 6's exception for "treaties" as further support for our holding.

A reading of the Convention on the High Seas in its pristine, black-letter absolutism would be seriously misleading.... Neither international treaties nor succeeding articles of the Convention exhaust the [exceptions to exclusive jurisdiction].

McDougal and Burke, *supra,* at 875. Consent to a boarding may thus fairly be characterized as within the treaty exception in Article 6. *Coast Guard Authority, supra,* at 329.

7. Defendants misconstrue this position as the reliance on Great Britain's consent—which is essentially a negative statement that they do not object—to provide affirmative authority for the boarding where none exists in United States law. To the contrary, the authority is explicitly provided by our own laws, as set forth in the text. The British consent merely brings these laws into operation.

This observation also disposes of defendants' argument that the British government may not have the power under its own laws to authorize boardings of its flag vessels, because it is the American laws, not the British, which authorize the boarding. Defendants have presented

the flag state consents, and thus there is no conflict between our domestic statute and the treaty.

Our next step is to note that 19 U.S.C. § 1587(a) establishes that the Coast Guard may board and examine vessels pursuant to a section 1581(h) special arrangement and applies the provisions of section 1581 generally to the boarding and subsequent search:

> (a) Any hovering vessel, or any vessel which fails (except for unavoidable cause) at any place within the customs waters or within a customs-enforcement area established under the Anti-Smuggling Act, to display lights as required by law, or which has become subject to pursuit as provided in section 1581 of this title, *or which being a foreign vessel to which subsection (h) of section 1581 of this title applies, is permitted by special arrangement with a foreign government to be so examined without the customs waters of the United States*, may at any time be boarded and examined by any officer of the customs, and the provisions of said section 1581 shall apply thereto. . . . [Emphasis supplied.]

Finally, 19 U.S.C. § 1581(a), made applicable by section 1587(a), provides,

> (a) Any officer of the customs may at any time go on board of any vessel or vehicle at any place in the United States or within the customs waters or, as he

may be authorized, within a customs-enforcement area established under the Anti-Smuggling Act, or at any other authorized place, without as well as within his district, and examine the manifest and other documents and papers and examine, inspect, and search the vessel or vehicle and every part thereof and any person, trunk, package, or cargo on board, and to this end may hail and stop such vessel or vehicle, and use all necessary force to compel compliance.

Under 19 U.S.C. § 1401(i), officers of the Coast Guard are brought within the definition of "officer of the customs." *See also* 14 U.S.C. § 143. The Coast Guard is therefore empowered to board and search vessels by virtue of this statute.

■■ We thus find in these statutes ample authority for the Coast Guard to board and search a foreign flag vessel on the high seas when the flag state consents.[8] Such authority is consistent with United States obligations under the Convention on the High Seas, *see* discussion *supra*, and therefore we conclude that the boarding of the Persistence met the requirements of both the statutes and treaties of the United States.[9]

## IV. FOURTH AMENDMENT

Finally, defendants argue that the boarding and, as the district court in fact ruled,

---

nothing to show that the British government may not, consistently with its own laws, assent to a boarding. We also note that the United States authorities are entitled to rely on the apparent authority of representatives of foreign governments. *See* Restatement (Second) of the Foreign Relations Law of the United States § 123.

Defendants also argue that the inquiry of the British government initiated by the State Department was an invasion of the President's power to conduct foreign relations in the absence of an explicit delegation of this specific authority, which they claim does not exist. We find nothing to suggest, however, that the State Department did not act properly here in exercising its delegated authority to manage foreign affairs. *See* 22 U.S.C. § 2656. The President has not complained of any unlawful usurpation of his role by the State Department. Nor is the State Department here making law in contravention of Congress' powers. To the contrary, the Department is acting pursuant to Congress'

explicit recognition that boarding of a foreign vessel may take place under an appropriate "special arrangement."

**8.** Because of our reliance on these statutes, we need not consider whether 14 U.S.C. § 89(a), which provides that officers of the Coast Guard "may at any time go on board of any vessel subject to the jurisdiction, or to the operation of any law, of the United States . . .," would also authorize the boarding of the Persistence. The Fifth Circuit has held that section 89(a) provides the Coast Guard with authority to conduct searches of foreign vessels. *United States v. Williams*, 617 F.2d at 1076; *United States v. Cadena*, 585 F.2d 1252 (5th Cir. 1978).

**9.** Defendants also argue that any authority the Coast Guard might have was taken away by the "Mansfield Amendment," 22 U.S.C. § 2291(c)(1), which provides in pertinent part that

> Notwithstanding any other provision of law, no officer or employee of the United States

the search, of the Persistence violated the fourth amendment. The fourth amendment prohibits unreasonable searches and seizures. We can perceive no violation here.

■■ As we have noted in past cases, the circumstances and exigencies of the maritime setting afford people on a vessel a lesser expectation of privacy than in their homes, obviating the usual fourth amendment requirements of a warrant. *See, e.g., United States v. Hilton*, 619 F.2d 127, 131 (1st Cir.), *cert. denied*, 449 U.S. 887, 101 S.Ct. 243, 66 L.Ed.2d 113 (1980). Heretofore, decisions in this circuit have focused on the constitutionality of maritime searches under a document and safety inspection rationale, but in our most recent opinion, *United States v. Arra*, 630 F.2d 836 (1st Cir. 1980), we noted, without expressly adopting, the Fifth Circuit's "reasonable suspicion" standard as recently set forth en banc in *United States v. Williams*, 617 F.2d at 1076, 1084. Under the latter standard, authorities may constitutionally stop, board, and search a vessel if they possess reasonable and articulable grounds for suspecting that the vessel or those on board are engag-

ing in criminal activities such as drug smuggling. *Accord United States v. Streifel*, 665 F.2d 414 (2d Cir. 1981) (reaching only the issues of stopping and boarding). We think it now appropriate to indicate our approval of the *Williams* reasonable suspicion standard, and, in that respect, to withdraw our dicta, made prior to the Fifth Circuit's holding in *Williams*, that consent or probable cause would be required to justify a non-administrative maritime search. *Hilton*, 619 F.2d at 131. We now hold that, in addition to permitting proper administrative searches, the fourth amendment allows government officers, who are otherwise authorized, to board and search a vessel on the high seas should they have reasonable and articulable grounds for suspecting that it is engaged in criminal activity.[10] Our present holding is not to be understood as giving officers carte blanche to search living quarters or personal effects, such as footlockers. The Fifth Circuit in *Williams* left open what degree of cause might be deemed reasonable under the fourth amendment in such circumstances, 617 F.2d at 1087 n.26, and we agree that consideration of this should wait until a future time.[11]

■ In this case, the officers of the Reliance had reasonable and articulable

may engage or participate in any direct police action in any foreign country with respect to narcotics control efforts.
Defendants cite traditional principles of international law to suggest that a foreign flag vessel is part of the territory of its flag state, and thus a "foreign country" within the meaning of this statute. We doubt, however, that the Mansfield Amendment was aimed at preventing United States authorities from taking otherwise lawful measures in international waters off our coasts. In any case, the legislative history of the provision makes it clear that it was only intended to "insure that U. S. personnel do not become involved in sensitive, internal law enforcement operations which could adversely affect U. S. relations with that country." S.Rep.No.94–954 at 55, *reprinted in* [1976] U.S.Code Cong. & Ad.News, 1373, 1431. Given Great Britain's consent to the boarding, such was not the case here. The statute was not violated.
Finally, defendants argue that a State Department regulation, 22 C.F.R. § 83.7, prohibits the boarding and search. The regulation states that "[u]nder the general principles of international and maritime law," crimes committed on

the high seas "are cognizable only in the courts of" the flag state. But the regulation—promulgated in 1957—cannot negate the extraterritorial effect of statutes such as the narcotics laws whose violation is charged here. Moreover, the regulation by its terms prohibits none of the actions taken by either the Coast Guard or the State Department. It appears to function simply as a source of information for State Department officials.

**10.** We might add that we are aware of no cases dealing with searches and seizures of vessels that enunciate a standard under which the boarding and search of the Persistence would, on the present facts, be unconstitutional or otherwise require the suppression of the evidence discovered.

**11.** We see no merit to the argument that the search here intruded on any such specially private and personal areas. The fact that the crew also bunked in the cabin below would not render the cabin generally off limits to searching officers on a boat of this size and character, where virtually all shipboard functions might be expected to take place in the cabin area, including stowage of some cargo.

grounds for suspecting that the Persistence was smuggling marijuana. In April 1980, a Coast Guard helicopter ,had surprised the Persistence (a 52-foot ocean racing sloop) in a rendezvous with a fishing vessel. The ships had taken off in different directions. A different Coast Guard cutter had caught up with the Persistence later that day, boarded, and found a man who was the subject of a Drug Enforcement Administration warrant. Three days later, the Coast Guard had located the fishing vessel in New York with marijuana residue in the hold.[12] When the Reliance sighted the Persistence in August, she was riding sluggishly, low in the water, and heavy in the bow. Moreover, she did not respond until after two hours to the Coast Guard's efforts to hail her by radio. The response then consisted of Daniels' internally contradictory references to Bermuda and a hurricane. These facts, when taken together, gave the officers a reasonable and articulable suspicion that the Persistence was carrying marijuana below deck. The marijuana was therefore properly discovered and properly seized and should not have been suppressed.

*Reversed and remanded.*

12. The foregoing facts were not relayed in full detail to the crew of the Reliance. Rather, they were subsumed in the conclusion (which *was* given to the Reliance) that the Persistence was a "category 3" drug suspect of the El Paso Intelligence Center list.