413 F.Supp.2d 60 (2006)
UNITED STATES of America, Plaintiff,
v.
Luis Segundo VILCHENAVARRETE, et al., Defendants.
No. 05-66 (PG).
United States District Court, D. Puerto Rico.
January 27, 2006.
*61 *62 Rosa E. Rodriguez-Velez, United States Attorney's Office, Torre Chardon, Rose M. Vega, United States Attorney's Office, Timothy R. Henwood, United States Attorney's Office, Torre Chardon, San Juan, PR, for USA, Plaintiff.
Hector A. Deliz, Deliz & Torres Gonzalez Law Office, Ignacio Rivera-Cordero, Rivera, Barreto & Torres Manzano Law Office, Jose C. Romo-Matienzo, San Juan, PR, for Luis Segundo Vilches-Navarrete, Defendant.
Joseph C. Laws, Federal Public Defender's Office, Juan F. Matos-De-Juan, Federal Public Defender's Office, Hato Rey, PR, for Luis Fernando Piedrahita-Calle also known as Luis Fernando Piedralita-Calle, Defendant.
Rachel Brill, San Juan, PR, for Mardonio Emilio Chavez-Sentti, Defendant.
Juan G. Nieves-Cassas, Nieves Cassas, De Luna & Feria Cestero, San Juan, PR, for Venel Dumas, Defendant.
Anita Hill-Adames, Anita Hill Law Office, San Juan, PR, for Edwin Damaso-Montufar, Defendant.
Eric M. Quetglas-Jordan, Quetglas Law Office, San Juan, PR, for Job Emmanuel Jean, Defendant.
Gabriel Hernandez-Rivera, Law Offices of Gabriel Hernandez Rivera, San Juan, PR, for Aldo Nolberto Marcos-Lara, Defendant.
Marlene Aponte-Cabrera, Aponte Cabrera Law Offices, San Juan, PR, for Pedro Armengolt Valladares-Benitez, Defendant.
Esther Castro-Schmidt, San Juan, PR, for Halfani Omari-Sudi, Defendant.

OPINION & ORDER
PEREZ-GIMENEZ, District Judge.
Before the Court is defendant Pedro Valladares-Benitez's "Motion to Dismiss Indictment and to Suppress Evidence and *63 Statements" (Docket No. 95).[1] For the reasons set forth below, defendant Valladares-Benitez' motion is DENIED with regards to dismissal and suppression of evidence, and HELD IN ABEYANCE until trial with regards to suppression of statements. Also before the Court is defendant Emmanuel-Jean's "Motion to Suppress Post-Arrest Statements" (Docket No. 96), which the Court hereby HOLDS IN ABEYANCE until trial.

I. Factual Background[2]
In order to place the facts of this case in their proper legal context from the outset, the Court notes that, as explained in more detail in section III(D), infra, to satisfy the strictures of the Fourth Amendment in the maritime context the government need only show that the Coast Guard acted upon "reasonable and articulable grounds for suspecting that the vessel or those on board [were] engaging in criminal activities . . ." United States v. Green, 671 F.2d 46, 53 (1st Cir.), cert. denied 457 U.S. 1135, 102 S.Ct. 2962, 73 L.Ed.2d 1352 (1982). With this standard in mind, the Court now sets out the relevant facts.
On January 31, 2005, a United States Coast Guard Cutter was instructed to intercept and board the 165-foot coastal freighter M/V Babouth, which was located on the high seas approximately 70 nautical miles off the coast of Trinidad and Tobago. The government has proffered that the initial decision to approach the Babouth was based on "specific and reliable intelligence" regarding the vessel's transportation of "a large quantity of cocaine" (Docket No. 131 at 14), and on the fact that the Coast Guard had monitored the ship throughout the previous night and observed smaller vessels traveling at high speeds towards it. Upon approaching the vessel, Coast Guardsman Mike Azevedo noticed the ship had distinguishing rub marks on its port side, but not on its starboard, an observation that tended to confirm the information they had gathered earlier through radar surveillance. The Coast Guard officers determined that the ship bore the flag of Honduras and, after obtaining a verbal statement of no objection to board the vessel and exercise jurisdiction over it from that nation, boarded the Babouth. Coast Guardsman Michael Azevedo first had a two-man team perform an Initial Safety Inspection of the vessel to guarantee its integrity and seaworthiness, while another two-man team secured the crew at the front of the ship's superstructure. After asking the master of the vessel routine questions, officer Azevedo requested that he produce the ship's registration documentation. Though the ship's master handed officer Azevedo a Trinidadian affidavit stating that the original documentation had been lost, the boarding crew later found it on board the vessel. Officer Azevedo also noticed that, while the ship carried 560 pallets of concrete, only 350 were slated for delivery, a fact the master could not explain. Additionally, the ship's global positioning system and navigation charts had been erased of all their data making it impossible to trace the Babouth's travels.
The Coast Guard boarding team continued searching the vessel throughout the night and into the morning of February 1, *64 2005. Officer Azevedo requested that he be given more personnel to continue the boarding of the mammoth vessel, and told his officer in charge that a dockside boarding would be safer and more productive. On February 2, 2005, officer Azevedo was informed, that the USCG vessel Shamal would be on scene to assist and augment the boarding team. Coast Guard personnel performed ion scans on the Babouth's crew, as well as on various locations throughout the vessel. Five of the nine crew members as well as several areas of the ship tested positive for cocaine particles. During the search at sea, one of the crew members (Luis Fernando Piedrahita-Calle) made contact with a member of the boarding party and stated that the ship's captain, Luis Vilches-Navarrete, was known to offer his vessel to drug smuggling organizations for transportation of illegal narcotics. Piedrahita-Calle also stated that a subject, later identified as Halfani Omari-Sudi, had arrived on board with approximately twenty-five thousand dollars in U.S. currency, which he believed to be associated to a narcotics transaction.
On February 3, 2005, Officer Azevedo found 17 grams of what appeared to be amphetamines and 58 grams of what appeared to be heroin in common spaces throughout the vessel. His suspicion was also aroused by an ICOM SSE Radio Telephone, ten 55-gallon drums, and an external 500 gallon fuel tank, which allows for quick refueling from the outer hull of the vessel. On February 4, 2005, while the boarding and search of the Babouth continued at 29 nautical miles west of St. Croix, USVI, officer Azevedo was directed to take the vessel to San Juan. On February 5, 2005, Immigration and Customs Enforcement (ICE), Federal Bureau of Investigation (FBI) and Drug Enforcement Administration (DEA) agents were transferred on board the Babouth before the vessel entered the port of San Juan. At 7:25am of February 5, 2005, the M/V Babouth docked at the Coast Guard pier in San Juan.
Once the vessel was moored, the boarding continued, now aided by a multi-agency team. On February 6, 2005, a Customs and Border Protection canine was deployed on the vessel and alerted to the presence of narcotics, pursuant to which the boarding crew removed several pallets of cargo with negative results. That same day, the multi-agency boarding team also unloaded fuel and liquid ballasts in order to inspect all tanks. On February 7, 2005, while the search of the vessel's cargo hold and tanks continued, defendant Piedrahita-Calle tossed a note in the direction of Coast Guardsman Angel Rodriguez that conveyed the former's desire to talk to the boarding team. After agreeing on a plan so that the rest of the crew did not see Piedrahita-Calle speaking to the authorities, the defendant informed officer Rodriguez that he had noticed a secret compartment covered by a manhole, located by the stern tank. BMC Rodriguez drew a diagram of the area, where Piedrahita-Calle pointed to the location he had described earlier.
Armed with this information, BMC Rodriguez and MK3 Azevedo proceeded to the area Piedrahita-Calle had pointed out and peeled off several vinyl tiles that were adhered to the deck with fresh contact cement. The officers found a wooden hatch with a handle under the linoleum and, upon opening it, found 8-12 inches of sawdust and sand mixed with ammonia. When they removed the sawdust mixture, officer Azevedo found a hatch with a wrench to remove the bolts that secured it. Lieutenant Junior Grade Nicholas Friedman removed the bolts and was the first officer to access the tank to ensure that the space was gas-free and safe for entry. However, Lieutenant Friedman observed *65 the tank to be almost completely full of bags, making the certification difficult. Once secured, officer Azevedo removed one of the bales from inside the tank and tested it using a Narcotics Identification Kit, which alerted positive for cocaine. The team subsequently removed a total of 35 bales from inside the tank, all of which contained cocaine for a total of approximately 918 kilograms (2,030 lbs.) of the substance. Upon discovering the contraband, the boarding team transferred it to the custody of Customs and Border Patrol. Defendants were arrested and advised of their Miranda rights the same day.
During questioning by law enforcement officials, six of the nine crew members disclaimed any knowledge of the cocaine or how it arrived on board. However, two defendants, Chavez-Senti and Emanuel-Jean, made incriminating statements which implicated the entire crew in the alleged narcotics smuggling conspiracy. A criminal complaint was filed against defendants on February 8, 2005 (Docket No. 1), and they were ultimately indicted on March 2, 2005 for conspiracy and possession with intent to distribute five kilograms of cocaine or more in violation of 46 U.S.C.App. §§ 1903(a), (c)(1), (f), and (j), 21 U.S.C. § 960(b)(1)(B), and 18 U.S.C. § 2. (Docket No. 34).

II. Valladares-Benitez's Motion to Dismiss (Docket No. 95)
Defendants move for dismissal of the indictment on at least two, and at most three, grounds. The Court will consider each argument in turn.
A. Fourth Amendment Violations
First, defendants point, even if not pellucidly, to the alleged illegality and unreasonableness of the search of the M/V Babouth as a basis for dismissal. (Docket No. 95 at 5-7). The Court need not reach the merits of defendants' Fourth Amendment argument to adjudicate the motion to dismiss, as it is well established that the remedy for searches and seizures made without probable cause is to exclude the evidence wrongfully seized or obtained through the illegal search in order to deter future violations of the Fourth Amendment. United States v. Brunette, 256 F.3d 14, 19 (1st Cir.2001); Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961). Thus, insofar as defendants' motion can be read to seek dismissal on the grounds that the search of the M/V Babouth violated the Fourth Amendment, the same is DENIED, as the requested remedy would be unwarranted and plainly excessive. See United States v. Stokes, 124 F.3d 39, 44 (1st Cir.1997) (noting that "because the public maintains an abiding interest in the administration of criminal justice, dismissing an indictment is an extraordinary step."); see also Whitehouse v. United States Dist. Court, 53 F.3d 1349, 1359 (1st Cir.1995) ("When a federal court uses its supervisory power to dismiss an indictment it directly encroaches upon the fundamental role of the grand jury. That power is appropriately reserved, therefore, for extremely limited circumstances.").[3]
B. Unreasonable delay in bringing before a Magistrate
Next, defendants argue the indictment should be dismissed because the government *66 unreasonably delayed bringing them before a magistrate, and because defendants were detained for a prolonged and unreasonable period of time. (Docket No. 95 at 7-12). Properly understood, these arguments challenge the government's actions under Fed.R.Crim.P. 5(a) and under the Fourth Amendment as interpreted by County of Riverside v. McLaughlin, 500 U.S. 44, 111 S.Ct. 1661, 114 L.Ed.2d 49 (1991) (holding that the Fourth Amendment's requirement of prompt arraignment generally means within 48 hours of the warrantless arrest).
Rule 5(a) provides in pertinent part that "any person making an arrest without a warrant shall take the arrested person without unnecessary delay before the nearest available federal magistrate . . ." Fed.R.Crim.P. 5(a). Although Rule 5(a) does not specify what would constitute an unreasonable delay, courts have construed the Fourth Amendment as imposing a presumptive 48-hour time limit on detentions in the absence of a probable cause determination. McLaughlin, 500 U.S. 44, 111 S.Ct. 1661, 114 L.Ed.2d 49.[4] As a threshold matter, it is relevant to note that both Rule 5(a) and the 48-hours McLaughlin rule are triggered once individuals are arrested. Though defendants argue that their appearance before a magistrate was unreasonably delayed by the 5-day trip at sea and 2-day dockside search in San Juan, none of them were placed under arrest during those periods and thus the 48-hour rule and Rule 5(a) avail them not.
Defendants argue that they were effectively arrested the moment the Coast Guard boarded the vessel, as they were not free to leave. However, these attempts to transpose the definition of "custody" normally associated with the Fifth Amendment and custodial interrogations is unconvincing, as the Court has found no authority to support such analysis.[5] In fact, it is well settled that a routine inspection and boarding of the vessel on the high seas does not give rise to a custodial detention. United States v. Elkins, 774 F.2d 530, 535 n. 3 (1st Cir.1985). Additionally, even if the Court were to accept defendants' analogy from Fifth Amendment jurisprudence, given the Coast Guard's broad power to board and search vessels on the high seas (as more fully explained in section III, infra), where the Coast Guard has justifiably boarded a vessel for inspection, holding crew members in the stern of the ship while a search proceeds does not render them "in custody" for purposes of Miranda warnings. U.S. v. Keller, 451 F.Supp. 631 (D.P.R.1978).[6]
That the 48-hour rule and Rule 5(a) apply only once a defendant has been arrested makes sense in light of the purpose behind both rules. Rule 5(a) was enacted to prevent federal law enforcement from using the time between an arrest and presentment before a magistrate to procure a *67 confession. See Mallory v. United States, 354 U.S. 449, 452-53, 77 S.Ct. 1356, 1 L.Ed.2d 1479 (1957). Similarly, the Supreme Court has noted that the 48-hour limit prescribed by the Fourth Amendment is meant to "minimize the time a presumptively innocent individual spends in jail." McLaughlin, 500 U.S. at 58, 111 S.Ct. 1661 (emphasis added). Neither of these scenarios is implicated in the instant case. Defendants were arrested on February 7, 2006 and brought before Magistrate Judge Aida Delgado on February 8, well within the 48-hour period required by the Fourth Amendment and, therefore, in a presumptively reasonable amount of time under Fed.R.Crim.P. 5(a).
Even if applicable, neither Rule 5(a) nor the Fourth Amendment's 48-hour requirement aid defendants. As explained above, Rule 5(a) was designed to prevent federal law enforcement from using the time between arrest and presentment before a magistrate to procure a confession. However, the rule proscribes "unreasonable delay", not all delay, thus calling for a totality of circumstances analysis. Any other interpretation would prove unduly restrictive, as some delay in taking prisoners before a magistrate is inevitable in light of the wide expanses of territory covered by district courts and the logistics associated with the transportation, remand, and booking of federal prisoners.
In the case at bar, the time spent transporting the vessel carrying defendants from the high seas for further search in Puerto Rico (approximately 5 days) was not an unreasonable delay in bringing defendants before a magistrate. The United States Coast Guard intercepted and boarded the M/V Babouth at approximately 70 nautical miles off Trinidad and Tobago, and proceeded to Puerto Rico without delay. There is no evidence on the record that the Coast Guard purposely slowed their progress or took a longer route than necessary. Quite simply, the Coast Guardsmen could not have brought defendants before a Magistrate while they were at sea. Thus, based on the current record, the delay caused by the 5 clay trip from the high seas to Puerto Rico was plainly reasonable for purposes of Fed.R.Crim.P. 5(a). Similarly, assuming the defendants were in fact arrested for purposes of the rule when the ship moored, the alleged delay in bringing defendants before a magistrate once they arrived in Puerto Rico was reasonable. Once the vessel docked, the Coast Guard and other government agencies continued the search in earnest. Given the size of the M/V Babouth (165 feet long) and the complexity of the search confronting the agents, it is perfectly reasonable that they did not take defendants before a magistrate until three days after their arrival.[7]
As to the Fourth Amendment's 48-hour rule, it is well settled that "where an arrested individual does not receive a probable cause determination within 48 hours," the burden is on the government "to demonstrate the existence of a bona fide emergency or other extraordinary circumstance." McLaughlin, 500 U.S. at 57, 111 S.Ct. 1661. Though again emphasizing the fact that defendants had not been arrested during the trip from the high seas to Puerto Rico or during the Coast Guard's dockside search of the M/V Babouth, we assume, arguendo, that the 48-hour *68 period began to count from the moment the vessel was moored.[8] Preliminarily, it should be noted that defendants arrived in San Juan on the morning of February 5, 2005 and were taken before a Magistrate on the morning of February 8, 2005. Consequently, we are not faced with a situation where the delay was substantial. Even so, the circumstances surrounding the search of the vessel justify any delay that might have occurred in this case. As mentioned above, the size of the M/V Babouth, (165 feet long) and the complexity of the search confronting the agents amount to the kind of extraordinary circumstances the government must show to rebut the Fourth Amendment's presumption of unreasonableness in this case.
In any event, even assuming that the 48-hour rule and Rule 5(a) applied to the period in question, and that a violation in fact occurred, the remedy defendants seek (dismissal of the indictment) is simply not available to them. The First Circuit has left open the question whether Rule 5(a) can ever be a basis for dismissal of an indictment absent evidence of unwarranted interrogation during the period of detention, Encarnacion, 239 F.3d at 400 n. 5. In light of this doctrinal opening, the Court is persuaded by the reasoning and holdings of the Second and Fifth Circuits on this point. These Courts have reasoned that the "principal purpose for speedy arraignment by a judicial officer is to inform the accused `without unnecessary delay' of his privilege against self incrimination." Lovelace v. United States, 357 F.2d 306, 310 (5th Cir.1966). Thus, where delay is not used, to subject defendant to unwarranted interrogation, no prejudice results, and violation of Rule 5(a) does not warrant dismissal of the indictment. United States v. Morrison, 153 F.3d 34, 56 (2nd Cir. 1998). Having made no such claim of prejudice, there is no reason to dismiss the indictment on this ground.
Consequently, for the reasons discussed in this section, defendants' motion to dismiss the indictment on grounds of unreasonable delay in bringing them before a Magistrate is DENIED.
C. Consular Notification
Lastly, defendants rely on Article 36(1)(b) of the Vienna Convention on Consular Relations, April 24, 1963, 21 U.S.T. 77 (ratified November 24, 1969) (the "Vienna Convention") and on Article 35(2) of a Bilateral Convention in support of their motion to dismiss. (Docket No. 95 at 13-17). As to the latter, defendants do not provide any citation that would direct the Court to the particular Bilateral Convention they rely on. By definition, bilateral conventions are treaties entered into by the United States and another nation, and thus a bilateral convention between the United States and one country does not have any effects with regards to a different nation. However, for the sake of assiduousness, the Court will assume, arguendo, that Article 35(2) of the Bilateral Convention quoted by defendants is typical of any bilateral treaty on consular relations that could be relevant to the case at bar.
Even with that generous assumption, defendants' reliance on the treaties is unavailing. In United States v. Li, 206 F.3d 56 (1st Cir.2000), the First Circuit considered the same argument defendants now press and concluded that, even assuming *69 the Vienna Convention and the Bilateral Convention conferred individual rights to consular notification, "the appropriate remedies do not include suppression of evidence or dismissal of the indictment." Id. at 60. Because defendants in the instant case are requesting dismissal of the indictment, the Court finds the Li case controlling. Consequently, defendant's motion to dismiss on the grounds that the government failed to give consular notification is DENIED.

III. Valladares-Benitez's Motion to Suppress (Docket No. 95)
Defendants argue that the cocaine discovered in, and seized from, the M/V Babouth should be suppressed as fruit of an illegal search, raising the protections afforded by the Fourth Amendment. (Docket No. 95 at 17-26). Defendants also move for exclusion of certain unspecified statements allegedly obtained in violation of their rights under the Fifth Amendment. As to the statements, the Court will reserve its ruling until trial so as to evaluate the statements in their proper factual context.
A. Coast Guard's Authority to Board and Search the M/V Babouth
Defendants argue that the Coast Guard somehow "exceeded its authority and abused its position" in approaching, searching and transporting the M/V Babouth to Puerto Rico, because it went beyond its "Congressional delegation of authority". (Docket No. 95 at 10). The argument borders on frivolity, as it is pellucid that the Coast Guard acted under valid statutory authority pursuant to 14 U.S.C. § 89(a), which states:
The Coast Guard may make inquiries, examinations, inspections, searches, seizures, and arrests upon the high seas and waters over which the United States has jurisdiction, for the prevention, detection, and suppression of violations of laws of the United States. For such purposes, . . . officers may go on board of any vessel subject to the jurisdiction, or to the operation of any law, of the United States, address inquiries to those on board, examine the ship's documents and papers, and use all necessary force to compel compliance.
The United States had jurisdiction over the M/V Babouth because the flag state of Honduras issued a statement of no objection to the United States' exercise of its jurisdiction, and thus the Coast Guard acted within its powers under § 89(a).
B. Applicability of the Fourth Amendment
The Fourth Amendment to the U.S. Constitution guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . ." U.S. CONST. amend. IV. However, it is axiomatic that the Fourth Amendment was not "understood by contemporaries of the Framers to apply to activities of the United States directed against aliens in foreign territory or in international waters." United States v. Verdugo-Urquidez, 494 U.S. 259, 267, 110 S.Ct. 1056, 108 L.Ed.2d 222 (1990). Though neither party has raised or briefed the Verdugo-Urquidez issue, the Court thinks it essential to the case. In light of the Supreme Court's holding in Verdugo-Urquidez, it is pellucid that the Fourth Amendment does not apply to the search of non-resident aliens on a ship in international waters. All defendants in the instant case are aliens to whom the guarantees of the Fourth Amendment do not apply, at least while the ship was in the high seas. Thus, that portion of defendants' motion that challenges the Coast Guard's search while the *70 ship was on the high seas is DENIED without need to go any further.
However, this holding does not dispose of defendants' challenge of the dockside search in Puerto Rico. At first glance, it would appear that the Court's holding in Verdugo-Urquidez would not extend to that portion of the Coast Guard's search that took place while the M/V Babouth was moored in San Juan. See Verdugo-Urquidez, 494 U.S. at 274-75, 110 S.Ct. 1056 (holding that the Fourth Amendment did not apply in part because the place searched was located in Mexico). It could be argued that Verdugo-Urquidez ceased to apply the moment the vessel arrived in San Juan, because the vessel's and defendants' presence within United States territory sparked Fourth Amendment protections. However, for at least two reasons, the Court is persuaded that the analysis and language adopted by the Verdugo-Urquidez majority extends to the case at hand and makes inescapable the conclusion that the Fourth Amendment does not protect these defendants.
First, it is a fundamental rule of maritime law that "[s]hips shall sail under the flag of one State only and, save in exceptional cases . . . shall be subject to its exclusive jurisdiction on the high seas." Convention on the High Seas art. 6(1), opened for signature April 29, 1958, 13 U.S.T. 2312 (entered into force Sept. 30, 1962) (emphasis added); see also United States v. Hensel, 699 F.2d 18, 27 (1st Cir.1983) (citing the Convention on the High Seas). Given flag nations' exclusive jurisdiction over their vessels, it would logically follow that, like embassies, ships are the functional equivalent of their flag nations. If this is so, then a search of a foreign-flagged vessel is the equivalent of a search in foreign territory where the Fourth Amendment does not apply. Verdugo-Urquidez, 494 U.S. at 267, 110 S.Ct. 1056. In this case, the M/V Babouth was a Honduran-flagged vessel. Thus, the search of the Babouth by the Coast Guard and other federal law enforcement agencies was the equivalent of a search conducted within the territory of Honduras. Consequently, in light of Verdugo-Urquidez, defendants, as aliens, find no protection in the Fourth Amendment, as the search they complain of for all practical purposes was conducted in foreign territory. Id.[9]
Second, even if the vessel is not deemed to be the functional equivalent of foreign territory, the Court's conclusion still stands. The lynchpin of the Supreme Court's holding in Verdugo-Urquidez was the fact that the defendant in that case was "an alien who ha[d] no previous significant voluntary connection with the United States . . ." Verdugo-Urquidez, 494 U.S. at 271, 110 S.Ct. 1056. In fact, the Court expressly rejected the defendant's argument that his presence within the U.S. at the time of the search (he was incarcerated in California awaiting trial) granted him shelter under the Fourth Amendment. Id. (holding that "this sort of presence-lawful but involuntary-is not of the sort to indicate any substantial connection with our country."). It being clear that the alien's presence within the U.S. is not enough to trigger Fourth Amendment protections, it would be untenable to suggest that the presence of the place searched (in this case a large inter-coastal shipping vessel) ipso facto would warrant a different result. In this case, both defendants' and the vessel's presence in the United States are indistinguishable *71 from the presence Chief Justice Rehnquist referred to in Verdugo-Urquidez, as neither indicate "any substantial connection with our country" so as to implicate the Fourth Amendment. Id.; cf. Kwong Hai Chew v. Colding, 344 U.S. 590, 596 n. 5, 73 S.Ct. 472, 97 L.Ed. 576 (1953) (holding that "once an alien lawfully enters and resides in this country he becomes invested with the rights guaranteed by the Constitution to all people within our borders.") (emphasis added). Just as the applicability of the Fourth Amendment to the search of property located in Mexico should not "turn on the fortuitous circumstance of whether the custodian of its nonresident alien owner had or had not transported him to the United States at the time the search was made," we do not believe that it should turn on the equally fortuitous circumstance that the search of a foreign-flagged inter-coastal shipping vessel manned completely by aliens was completed within U.S. territory.
Consequently, defendants' motion to suppress is DENIED, as they cannot claim any rights under the Fourth Amendment.
C. Defendants' Standing under the Fourth Amendment
Alternatively, even if the Fourth Amendment were deemed applicable, the Court would still deny defendants' motion because they all lack standing to challenge the search. An individual's Fourth Amendment right to be free from unreasonable searches is implicated when he or she (1) has "manifested a subjective expectation of privacy" in the place searched, which (2) "society accepts as objectively reasonable." California v. Greenwood, 486 U.S. 35, 39, 108 S.Ct. 1625, 100 L.Ed.2d 30 (1988); see also O'Connor v. Ortega, 480 U.S. 709, 715, 107 S.Ct. 1492, 94 L.Ed.2d 714 (1987); Katz v. United States, 389 U.S. 347, 361, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) (Harlan, J., concurring). It is "well settled law that a defendant who fails to demonstrate a legitimate expectation of privacy in the area searched or the item seized will not have standing to claim that an illegal search or seizure occurred." United States v. Mancini, 8 F.3d 104, 107 (1st Cir.1993). To demonstrate a subjective expectation of privacy, the Court "has required little more than evidence that defendants made some minimal effort to protect their property or activities from warrantless intrusions." United States v. Cardona-Sandoval, 6 F.3d 15, 20-21 (1st Cir.1993). Similarly, there is "no talisman that determines in all cases those privacy expectations that society is prepared to accept as reasonable." O'Connor, 480 U.S. at 715, 107 S.Ct. 1492. The reasonableness of an expectation of privacy and proper standard for a search vary according to context. Id. Because of the "circumstances and exigencies of the maritime setting," the First Circuit has recognized "that individuals have a diminished expectation of privacy on a vessel as opposed to that which can be claimed in their homes." Cardona-Sandoval, 6 F.3d at 21. See, e.g., Green, 671 F.2d at 53; United States v. Hilton, 619 F.2d 127, 131 (1st Cir.), cert. denied 449 U.S. 887, 101 S.Ct. 243, 66 L.Ed.2d 113 (1980).
Defendants in the case at bar must be divided into two groups for the purpose of measuring the legitimacy of their expectation of privacy: the captain and the crew members. Cardona-Sandoval, 6 F.3d at 21. In Cardona-Sandoval the First Circuit held that the captain of a vessel, here defendant Vilches-Navarrete, has "a cognizable expectation of privacy from unauthorized police intrusions everywhere aboard his ship" derived "from his custodial responsibility for the ship, his associated legal power to exclude interlopers from unauthorized entry to particular *72 places on board, and the doctrines of admiralty, which grant the captain (as well as the owner) a legal identity of interest with the vessel." Id. However, Cardona-Sandoval's holding vis-a-vis the captain of the vessel can be distinguished from the instant case on at least two grounds. First, unlike the captain in Cardona-Sandoval, defendant Vilches-Navarrete did not object to having his boat searched and taken to Puerto Rico, and thus did not "[manifest] his subjective expectation of privacy in the vessel." Id. In fact, Coast Guardsman Jeffery S. Ryan reported that the master gave his permission to the boarding team "to access any space on the vessel." (Docket No. 95, Ex. 1). Second, the legitimacy and reasonableness of Vilches-Navarrete's expectation is undermined by the fact that, unlike the vessel involved in Cardona-Sandoval (a Florida-flagged ship), the M/V Babouth is a Honduran-flagged vessel. This fact is relevant because, as explained above, foreign-flagged vessels are under the exclusive jurisdiction of the flag nation, which can consent to the boarding and search of the vessel by another nation. This authority to consent to searches undercuts Vilches-Navarrete's "power to exclude interlopers from unauthorized entry to particular places on board", as well as his "legal identity of interest with the vessel," two facts central to the First Circuit's holding in Cardona-Sandoval. Cardona-Sandoval, 6 F.3d at 21.[10] Having thus distinguished the facts of this case from those of Cardona-Sandoval, it is evident that the captain of the M/V Babouth, defendant Vilches-Navarrete, had no more reasonable expectation of privacy in the ship than the rest of the crew.
As to the objective reasonableness of the crew members' expectation of privacy, a number of cases have limited the areas of a vessel in which they legitimately possess an expectation of privacy. See United States v. Arra, 630 F.2d 836, 841 n. 6 (1st Cir.1980) (questioning, without deciding, whether crew members have right to challenge search in areas other than living quarters); United States v. Peterson, 812 F.2d 486, 494 (9th Cir.1987) (crew has no privacy interest in cargo hold); United States v. Thompson, 928 F.2d 1060, 1065 (11th Cir.) (recognizing differences between private areas or footlockers and cargo holds), cert. denied 502 U.S. 897, 112 S.Ct. 270, 116 L.Ed.2d 222 (1991). The underlying principle of these cases is that "a crew member cannot have an expectation of privacy in a space the Coast Guard is free to inspect in the course of a document and safety check." Cardona-Sandoval, 6 F.3d at 22.
Defendants in the instant case rely on Cardona-Sandoval for the overly-broad proposition that they, as crew members, have standing to contest a search of the M/V Babouth. However, defendants choose to ignore the First Circuits explicit distinction between small pleasure vessels and cargo ships and freighters, which would inevitably doom their arguments in this case. Specifically, the Court of Appeals observed that cases "involving substantial vessels, such as cargo ships and freighters, must be distinguished from the case at hand . . . [i]t is quite understandable that in dealing with a major vessel, a court should distinguish among areas, treating some as not susceptible to a reasonable expectation of privacy by a crew member." Id. The Court went on to note that

*73 "[f]or example, the short hand designation of a freighter's cargo hold as a common area, in which no crew member could possess a reasonable expectation of privacy, is not objectionable in the factual context of those cases [dealing with substantial vessels] by reason of the size of the vessel and the de facto limitation of space which the crew member can claim as private."
Id. Unlike the small pleasure craft involved in Cardona-Sandoval, the M/V Babouth is a 165-foot coastal freighter, which implies ipso facto that there are few areas in which individual crew members can claim a legitimate expectation of privacy. Additionally, the cocaine seized in this case was found in a secret compartment hidden underneath the linoleum floor of the kitchen (a common area in itself) and secured by two latches, the second of which was covered with 8-12 inches of sawdust and sand mixed with ammonia and bolted down.[11] Quite plainly, this is an area in which no crew member of a ship with the characteristics of the M/V Babouth could have had an expectation of privacy.
In a last ditch effort, defendant Valladares-Benitez argues that he had an expectation of privacy in the place searched because "the hidden compartment in which the narcotics were stashed was located in the entrance to the engine room, which coincides with the entrance and access to the private quarters of Defendant." (Docket No. 95 at 19). This argument is of no avail. The First Circuit has already rejected the argument that the crew members have an expectation of privacy because they bunk in the same area below deck where contraband is found. United States v. Green, 671 F.2d 46, 53 n. 11 (1st Cir.1982). The Court noted that "[t]he fact that the crew bunked in the cabin below would not render the cabin generally off limits to searching officers on a [52-foot sloop] where virtually all shipboard functions might be expected to take place in the cabin area, including the stowage of some cargo." Id. The facts found determinative in Green weigh even more heavily in this case against the existence of an expectation of privacy. By defendant's own admission, the area in question was adjacent to the engine room of the 165-foot vessel. This area was inherently subject to the entry and exit of people other than Valladares-Benitez, thus nullifying any expectation of privacy he night have harbored.
In any event, even if crew members could have a subjective expectation of privacy in the area that concerns us, the Court is convinced that it would not be one "society would accept as objectively reasonable." Greenwood, 486 U.S. at 39, 108 S.Ct. 1625; see also New Jersey v. T.L.O., 469 U.S. 325, 105 S.Ct. 733, 742, 83 L.Ed.2d 720 (1985) (holding that "the Fourth Amendment does not protect subjective expectations of privacy that are unreasonable or otherwise `illegitimate'"). The Supreme Court has cautioned that "we should not, as judges, merely recite the expectations and risks without examining the desirability of saddling them upon society." United States v. White, 401 U.S. 745, 786, 91 S.Ct. 1122, 28 L.Ed.2d 453 (1971) (Harlan, J., dissenting). Quite simply, society would not recognize a justifiable expectation of privacy in a hidden compartment created for the express purpose of hiding illicit contraband. To hold otherwise would grant smugglers standing *74 under the Fourth Amendment solely because they were careful in hiding their illicit merchandise. Such a result would be unacceptable, even repugnant, to society. See United States v. Sarda-Villa, 760 F.2d 1232, 1237 (11th Cir.1985) (holding that a "the search . . . of hidden fuel compartments in a boat . . . is a far cry from the search of a home or the personal belongings of a defendant").[12]
In sum, none of the defendants had a legitimate and objectively reasonable expectation of privacy in the place searched, and they thus lack standing to challenge the search of the M/V Babouth. Consequently, their motion to suppress should be, and is hereby, DENIED.
D. Reasonableness of the search
Finally, even if the Fourth Amendment were deemed applicable and defendants had standing to challenge the search under it, the disposition of defendants' motion to suppress would not change, as the search of the M/V Babouth was reasonable. The Coast Guard's authority under 14 U.S.C. § 89(a) to stop and board a vessel on the high seas is quite broad. Cardona-Sandoval, 6 F.3d at 23. The First Circuit has held that administrative safety and document inspections are permissible "even without any particularized suspicion of wrongdoing." Elkins, 774 F.2d at 533-34. Even if not based on the document and safety inspection rationale, the Coast Guard may conduct a search on the high seas upon "reasonable and articulable grounds for suspecting that the vessel or those on board are engaging in criminal activities . . ." Green, 671 F.2d at 53. The necessary "reasonable suspicion" may be formed on the basis of facts obtained during a safety and document inspection, and once reasonable suspicion exists the inspecting officers may even drill into a suspicious area to search for contraband. Elkins, 774 F.2d at 534. In the maritime context, "the relative intrusiveness of a search must be justified by a corresponding level of suspicion supported by specific facts gathered by investigating official." Cardona-Sandoval, 6 F.3d at 23. This standard allows for an expanding scope of search where justified by facts giving rise to further reasonable suspicion. Id., citing New Jersey v. T.L.O., 469 U.S. at 343-44, 105 S.Ct. 733.[13]
The facts of the present case offer a pellucid illustration of the principles explained above. The United States Coast Guard, acting pursuant to its authority under 14 U.S.C. § 89(a) and having obtained a statement of no objection from Honduras, boarded the M/V Babouth on suspicion that the vessel was involved in narcotics smuggling. Initial suspicion of the M/V Babouth was based on several facts. First, the government has proffered that the Coast Guard had "specific and reliable intelligence" regarding the vessel's transportation of "a large quantity of cocaine" (Docket No. 131 at 14). Second, the Coast Guard had monitored the ship throughout the previous night and observed smaller vessels traveling at high speeds towards the Babouth. Finally, upon approaching the vessel, Coast Guardsman Mike Azevedo noticed the ship had distinguishing rub marks on its port *75 side, but not on its starboard, an observation that tended to confirm the information they had gathered earlier through radar surveillance. (Docket No. 95, Ex. 9).
Upon boarding the vessel, the Coast Guardsmen's suspicions were enhanced by at least three facts. First, the master of the vessel produced a Trinidadian affidavit stating that the original vessel documentation was lost, a fact that was disproved when the documentation was found on board. (Docket No. 95, Ex. 9). Second, the M/V Babouth was carrying 560 pallets of concrete of which only 350 where slated for delivery, a discrepancy the master could not explain. Finally, the vessel's global positioning system and navigational charts had been erased of all data. These facts increased the officers' suspicion, and prompted them to continue their search.
As part of their inspection and search, the Coast Guardsmen deployed ion scan machines, which they ran on numerous areas of the vessel and on each crew member. Five of the nine crew members, as well as several areas of the vessel alerted positive for cocaine. (Docket No, 95, Ex. 9). The Coast Guardsmen also found what they believed to be small amounts of heroin and amphetamines in the common space of the vessel, as well as an ICOM SSB radio telephone, and ten 55-gallon drums and an external 500 gallon fuel tank, which allow for quick refueling on the outer hull of the vessel. (Docket No. 95, Ex. 9). While the search progressed, a crew member, Luis Fernando Piedrahita-Calle, made contact with a member of the boarding party and stated that the ship's captain, Luis Vilches-Navarrete, was known to offer his vessel to drug smuggling organizations for transportation of illegal narcotics. Piedrahita-Calle also stated that a subject, later identified as Halfani Omari-Sudi, had arrived on board with approximately twenty-five thousand dollars in U.S. currency, which he believed to be associated to a narcotics transaction.
Upon arrival in Puerto Rico, the authorities deployed a United States Immigration and Customs Enforcement canine on the vessel, which alerted to the presence of narcotics on board. Their suspicions thus whetted, the authorities continued their search and were later approached for a second time by crew member Piedrahita-Calle, who tossed a handwritten note in the direction of Coast Guardsman Angel Rodriguez that conveyed the former's desire to talk to the DEA. Piedrahita-Calle informed officer Rodriguez that he had noticed protruding linoleum tiles in an area of the kitchen where he remembered a secret compartment covered by a manhole. The defendant later pointed to the approximate location he was referring to on a diagram BMC Rodriguez drew for him. Armed with this information, the boarding team searched the area and found 918 kilograms of cocaine hidden in a secret compartment.
In light of the totality of the circumstances recounted above, it is plain that every one of the authorities' steps during their search of the M/V Babouth was based on a corresponding and proportional level of reasonable suspicion, making the search valid under the Fourth Amendment. Cardona-Sandoval, 6 F.3d at 23.[14] Consequently, defendants' motion to suppress must be, and is hereby, DENIED.

V. Conclusion
For the reasons set forth above, defendants' "Motion to Dismiss Indictment and *76 to Suppress Evidence and Statements" (Docket No. 95) is. DENIED with regards to dismissal and suppression of evidence, and HELD IN ABEYANCE until trial with regards to suppression of statements so as to evaluate each individual statement in its proper evidentiary and factual context. Similarly, defendant Emmanuel-Jean's "Motion to Suppress Post-Arrest Statements" (Docket No. 96) is HELD IN ABEYANCE until trial.
SO ORDERED.
NOTES
[1] Co-defendants Omari-Sudi (Docket No. 101), Emmanuel-Jean (Docket No. 104), Dumas (Docket No. 109), Vilches-Navarrete (Docket No. 116), and Marcos-Lara (Docket No. 118) have joined this motion.
[2] The facts are culled from the statements offered by Coast Guardsmen and other federal officers who participated in the different stages of the boarding and search, and which the defense included as exhibits to their motion. (Docket No. 95, Ex. 1, 9, 11, and 13).
[3] Admittedly, a search in violation of the Fourth Amendment could be an indirect source for the dismissal of an indictment when the evidence excluded leaves the government with no other evidence to substantiate the charges. However, defendants have not made a sufficiency of the evidence argument, and thus the issue is not properly before the Court.
[4] On the interaction of Rule 5(a) and the Fourth Amendment, the First Circuit has noted that "[w]hile the Rule 5(a) and Fourth Amendment contexts are certainly analogous, the 48-hours rule is a requirement of the Fourth Amendment, not rule 5(a)." United States v. Encarnación, 239 F.3d 395, 398 n. 2 (1st Cir.2001) (citation and internal quotation marks omitted).
[5] A suspect is considered to be "in custody" for purposes of the warnings required by Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), when there is "a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." Thompson v. Keohane, 516 U.S. 99, 116 S.Ct. 457, 465, 133 L.Ed.2d 383 (1995).
[6] Defendants' argument is further weakened by the fact that all of them were foreign nationals, and government agents could not let them disembark in San Juan even if they wanted to, as they were not legal immigrants.
[7] Of course, because government agents had not found any contraband during their dockside search on February 5 and 6, 2005, there were no grounds to arrest defendants and thus no reason to take them before a Magistrate. It bears repeating that, once arrested on February 7, defendants were brought before a Magistrate within less that the mandated 48-hours.
[8] This assumption is reasonable, as opposed to assuming that the 48-hour requirement was triggered when the Coast Guard boarded the ship on the high seas, because the Coast Guardsmen could not have taken defendants before a magistrate until they arrived on terra firma.
[9] Even though the government of Honduras consented to the United States' exercise of jurisdiction over their flagged vessel, this does not change the Court's analysis. This consent, far from being a renunciation of its exclusive jurisdiction, is an exercise (and therefore evidence) of the same.
[10] It is relevant to reiterate that Honduras in fact consented to the boarding and search of the M/V Babouth by the United States Coast Guard, a fact that essentially nullified any power Vilches-Navarrete's had to exclude people from the ship.
[11] According to Lieutenant Junior Grade Nicholas Frieden of the Coast Guard, the secret compartment corresponded with an aftwart ships tank labeled as a "day tank" or "service tank" in the ship's Damage Control and Stability Books and meant to hold fuel taken from the storage tanks close to the engines for ready service. (Docket No. 95, Ex. 11).
[12] The Court notes that, even if the captain is deemed to have an expectation of privacy in this case, it would not be one society accepts as objectively reasonable for these same reasons.
[13] Though a full, stem to stern, destructive search may only be conducted on the basis of probable cause, Cardona-Sandoval, 6 F.3d at 24, no such search is involved in the instant case, and thus the government need only show that it acted upon "reasonable suspicion".
[14] In fact, though unnecessary for its ruling, the Court notes that these facts might very well satisfy the more stringent showing of probable cause required for ordinary warrantless searches.